**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ira Nathan HEAPS, Defendant–
Appellant.**

No. 93–5923.

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1994.

Decided Oct. 31, 1994.

**ARGUED:** Richard W. Berne, Bronx, NY, for appellant. Anita Thomas, Sp. Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty., Alexandria, VA, for appellee.

Before HALL, MURNAGHAN, and NIEMEYER, Circuit Judges.

Reversed in part and affirmed in part by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge K.K. HALL joined. Judge NIEMEYER wrote an opinion concurring in part and dissenting in part.

## OPINION

MURNAGHAN, Circuit Judge:

### I

The defendant, Ira Nathan Heaps, has appealed from the judgment of the United States District Court for the Eastern District of Virginia finding him guilty of all counts of an eight-count indictment. Count 1 charged the defendant with conspiracy to possess and distribute methylendioxyamphetamine (MDA), commonly known as "ecstasy," in violation of 21 U.S.C. § 846. Count 2 charged the defendant with conspiracy to commit money laundering in violation of 18 U.S.C. § 371. Counts 3 and 4 charged the defendant with distribution of ecstasy in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts 5 and 7 charged the defendant with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2. Finally, Counts 6 and 8 charged the defendant with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. The defendant was sentenced on October 29, 1993, to 41 months confinement as to Counts 1, 3, and 4, and to 78 months confinement as to Counts 2, 5, 6, 7

and 8, to run concurrently with one another. He was also sentenced to a two-year period of supervisory release and special assessments totalling $400.

The charges stemmed from the distribution of ecstasy to Geoffrey Boccia and Gillian Beck, and the subsequent payment from Beck and Boccia to the defendant by wire transfer.

The Government called five witnesses in its case-in-chief, including Special Agent Robert Valentine of the Drug Enforcement Administration (DEA), Gillian Beck, Geoffrey Boccia, Stacey Maire, and Deputy United States Marshal David Drake. Agent Valentine testified that he purchased ecstasy from Beck and Boccia on five separate occasions between August 1991 and November 1991. He purchased 150 tablets of ecstasy from Beck and Boccia on August 9, 1991, in Washington, D.C. for $2,000. On September 6, 1991, Beck and Boccia sold 240 tablets to Agent Valentine for $3,500 in Alexandria, Virginia. During this purchase, Beck told Agent Valentine that the ecstasy came from two people in New York who were 40 or 45. On September 12, 1991, in Alexandria, Virginia, Beck distributed an additional 10 tablets to Agent Valentine in connection with the September 6, 1991 sale.

On October 5, 1991, in Washington, D.C., Agent Valentine purchased 85 tablets from Boccia. Prior to this sale, Beck and Boccia sold 115 ecstasy capsules of a different variety to Agent Valentine. Beck and Boccia testified that the 115 capsules were supplied by Jeffrey Saunders of California, not by the defendant. Finally, on November 13, 1991, in Alexandria, Virginia, Agent Valentine purchased 10,350 dosage units of LSD from Beck and Boccia for $5,000 in cash.

Beck testified that the defendant was a friend from New York. She and the defendant took two trips to Jamaica for which the defendant paid. Beck visited the defendant in New York on a regular basis and spoke to him over the telephone periodically. She testified that, with the exception of the purchase from Jeffrey Saunders, all of the ecstasy that she bought during the summer of 1991 was obtained from the defendant.

Boccia testified that he met the defendant in June, 1991, at a Grateful Dead concert in Washington, D.C. The defendant became a connection for the ecstasy that Beck and Boccia sold to the DEA. Boccia testified that during 1991 he supported himself by selling drugs and working as a bike messenger.

Boccia further testified that upon receiving a quantity of ecstasy from the defendant, he and Beck would pay for a portion of the ecstasy, sell the drugs, and then pay the outstanding balance from the profits of the ecstasy sales. Boccia testified that he and Beck bought the ecstasy for about $12 or $13 a hit, sold it in larger quantities for $13 or $14 a hit, and in smaller quantities for $20 and $25 a hit.

Both Beck and Boccia testified that in June, 1991, the defendant, through prearrangement with Beck, sold approximately 100 ecstasy pills to Beck which they then resold. The defendant next supplied 500 pills of ecstasy to Beck and Boccia on August 8, 1991, for $4,000 in New York. The day before this purchase Beck placed a phone call from her apartment to the defendant.

Beck testified that later in August, 1991, the defendant again supplied 500 hits of ecstasy to her and another friend in New York. Beck testified that she arranged to meet the defendant at "Frank's apartment," but the defendant was not there. She met with Frank, who told her that the defendant had left items for her in a dresser drawer. Beck stated that she retrieved ecstasy from the drawer. Beck described Frank as being between 40 and 45 years of age.

Boccia testified that the defendant supplied him with 500 hits of ecstasy on September 5, 1991 for $4,000. Boccia brought the ecstasy back to Washington, D.C., and sold it to Agent Valentine and others.

Beck testified that at approximately 11:25 p.m. on November 13, 1991, she wired, via Western Union, two money orders made out to "Stacey Maire." Stacey Maire was, at the time of the transactions, the defendant's girlfriend. She later became his wife. Beck stated that the defendant had instructed her and Boccia to send the money orders in the

name of "Stacey Maire." One money order was sent in the amount of $1,500 and the other for $500. The money Beck and Boccia sent to the defendant was the proceeds of the sale of LSD to Agent Valentine in Alexandria, Virginia, on November 13, 1991.

Both Beck and Boccia explained that the money orders were sent from Washington, D.C., as payment for ecstasy. Beck testified that the only reason she and Boccia owed money to the defendant was for ecstasy previously supplied to them.

Beck testified that after sending the money orders, she telephoned the defendant to confirm that it had been sent. Maire testified that she picked up the money in New York at the direction of the defendant. She cashed the two money orders, brought the $2,000 to the apartment that she and the defendant shared, and put the cash in a money box.

The DEA arrested Beck and Boccia on January 8, 1992. Beck cooperated with the DEA and made two undercover telephone calls to the defendant. The second call was made to discuss the wiring of more money to the defendant owed for previous supplies of ecstasy. Beck specifically asked if the next payment should be sent in the name of Stacey Maire. The defendant indicated that was not necessary for the next payment.

Deputy United States Marshall David Drake testified that he arrested the defendant in New York on February 26, 1993. After being arrested, the defendant asked Drake "What should I do? ... without incriminating myself, all I can tell you, I was in the wrong place at the wrong time." Drake told the defendant that the DEA in Washington would probably want to speak with him. The defendant said, "What, cooperate? ... I can't give up the big guy, I just can't."

## II

■ As a preliminary matter, the defendant has argued that the district court should have permitted a change of venue pursuant to F.R.C.P. Rule 21(b). Rule 21(b) provides in pertinent part:

For the convenience of the parties and witnesses, and in the interest of justice the court upon motion of the defendant may transfer the proceeding as to that defendant ... to another district.

The decision whether to transfer a case is committed to the sound discretion of the district court. *United States v. Espinoza,* 641 F.2d 153, 162 (4th Cir.), *cert. denied,* 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981). The district court may only be reversed if it has abused its discretion.

The defendant has asserted that since all activity conducted by him in furtherance of the crimes charged occurred in New York, he should not have had to stand trial in the Eastern District of Virginia, where he believes he was prejudiced by his status before a Virginia jury as a New Yorker.

■ At the outset, we note that venue was proper in the Eastern District of Virginia. We have held that venue is proper, in a multi-district conspiracy, in any district in which a conspirator has committed an overt act. *United States v. Martinez,* 901 F.2d 374, 376 (4th Cir.1990). Moreover, when a conspiracy is formed in one district and overt acts are taken in furtherance of it in other districts, venue is proper against all of the defendants in any one of those districts. *United States v. Levy Auto Parts,* 787 F.2d 946, 952 (4th Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 108, 93 L.Ed.2d 56 (1986). Since in the instant case overt acts in furtherance of two charged conspiracies occurred in the Eastern District of Virginia, the Southern District of New York, and the District of Columbia, venue properly lay in each of the three districts for Counts 1 and 2 of the indictment.

■ Similarly, the Government has asserted that venue was proper in the Eastern District of Virginia for Counts 3 through 8. We agree. The two distribution counts alleged distribution of ecstasy in Alexandria, Virginia. The money laundering counts stemmed from the wire transfer of money representing the proceeds of the sale of LSD in the Eastern District of Virginia. *See United States v. Beddow,* 957 F.2d 1330, 1336 (6th Cir.1992) (venue for a money laundering case is proper in any district in which the specified unlawful activity occurs).

The defendant challenges the Government's reliance on cases such as *Martinez* and *Levy Auto Parts, supra,* arguing that his case is distinguishable since he sought a change of venue away from a district in which he had conducted no activity, and to a district in which virtually all of his alleged conduct occurred. Moreover, since Beck and Boccia were neither charged, convicted, nor stood trial with him, the defendant argues that the district court erred in treating the instant case as an example of multidistrict litigation, rather than as a single defendant case. Had the alleged co-conspirators stood trial with him, the defendant concedes that venue would have been proper in the Eastern District of Virginia.

Though the defendant's argument is not without some appeal, we are unable to find that the district court abused its discretion in allowing the case to proceed in the Eastern District of Virginia. In making its decision, the district court relied on the factors enumerated by the Supreme Court in *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). There, the court noted ten factors which a court may consider in exercising its discretion: (1) location of the defendant; (2) location of witnesses; (3) location of events likely to be in issue; (4) location of documents and records; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket conditions in each district; and (10) any other specific element which might affect the transfer. *Id.* at 243–44, 84 S.Ct. at 771–72.

For the reasons stated by the district court we find that it did not abuse its discretion in the application of the *Platt* factors to the instant case. We note particularly that the activity charged, and for which the defendant had no small responsibility, was conducted almost entirely in the Eastern District of Virginia.

### III

The defendant has asserted that the evidence was insufficient to convict him of money laundering under 18 U.S.C. § 1956. The statute provides in pertinent part:

> Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified illegal activity ... with the intent to promote the carrying on of specified activity; or ... knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity....

shall be guilty of an offense. 18 U.S.C. § 1956(a)(1). In order to sustain a conviction under the statute, the Government must prove that: (1) the defendant conducted or attempted to conduct a financial transaction; (2) the property involved the proceeds of specified unlawful activity; (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; (4) the defendant engaged in the financial transaction with the intent to promote the carrying on of specified unlawful activity; or (5) while knowing that the transaction was designed in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity. 18 U.S.C. § 1956(a)(1); *United States v. Montoya,* 945 F.2d 1068, 1076 (9th Cir.1991).

The indictment charged violations of 18 U.S.C. § 1956 on two theories: first, that the $2,000.00 wire transfer from Beck to Stacey Maire was sent to promote the carrying on of specified unlawful activity, punishable under 18 U.S.C. § 1956(a)(1)(A)(i), and second, that the transaction was designed to disguise the source, ownership, or control of the proceeds of the unlawful activity, punishable under § 1956(a)(1)(B)(i). The defendant has argued that the evidence was insufficient to support his conviction for two reasons. First, he has argued that the Government never established that he *knew* that the money was unlawful proceeds. Second, he has argued that the Government failed to prove that the transaction alleged was intended to promote the carrying on of specified unlawful activity, or that it was designed to conceal or disguise the nature, the location, the source,

the ownership, or the control of the proceeds of the specified unlawful activity.

Since the parties rightly agree that both theories require proof that the defendant conducted the transactions in question knowing that the property involved represented the proceeds of some form of illegal activity, it is to that question that we first turn our attention.

## A

■ Section 1956(a)(1) requires the Government to prove that the defendant had "actual subjective knowledge" that the money used in a money laundering transaction was derived from an unlawful source. *United States v. Campbell*, 977 F.2d 854, 857 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993). The defendant may not be convicted on just what he should have known. *Id.* However, both direct and circumstantial evidence can be used to establish knowledge and are given the same weight. *United States v. Awan*, 966 F.2d 1415, 1434 (11th Cir.1992).

■ Viewing the evidence in the light most favorable to the Government, *Goldsmith v. Witkowski*, 981 F.2d 697, 701 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993), we find that the evidence of the defendant's subjective knowledge of the source of the funds was sufficient to sustain the conviction. The Government presented circumstantial evidence from which a jury could reasonably infer that the defendant knew that the $2,000 wired to him were proceeds from the sale of drugs. The evidence established that Beck and Boccia were drug dealers and that during the summer and fall of 1991 the defendant was their primary source of ecstasy. Boccia's primary means of support was by dealing drugs supplied by the defendant. Beck and the defendant were friends, and the evidence showed that she and Boccia were fronted drugs by the defendant for later payment.

The defendant's principal objection appears to be to the district court's apparent belief that conviction under the statute could be sustained under an objective knowledge standard. The district court, in denying the defendant's motion to dismiss, stated:

> it seems to me that the circumstantial evidence of one who fronts drugs and expects the payment back from it is on notice and has knowledge that the money is going to be coming from drugs. Just as if he was consigning grain, consigning corn, you expect the money is coming back from the corn sales.

It is true that the district court's comment perhaps betrays confusion about the requirement that subjective knowledge be proved. However, the evidence outlined above certainly was sufficient for a rational trier of fact to conclude that the defendant knew the money sent him as payment for illegal drugs was itself derived from the sale of illegal drugs.

## B

■ As to Counts 5 and 7 of the indictment, the Government was required to prove that the defendant engaged in a financial transaction with the intent to promote the carrying on of specified unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i).

The Government has predicated its argument that the transfer of the $2,000 was intended to promote the carrying on of specified unlawful activity on two theories: first, that the transfers were done to establish goodwill to promote future sales of ecstasy by the defendant; second, that the transfers completed the antecedent drug distributions.

However, there has been no adequate distinction between the coming in to the defendant of possession and the subsequent use thereafter, *i.e.,* while the money was going out. The first of the Government's theories is, therefore, baseless. There was absolutely no evidence presented that the payment was made to create goodwill for subsequent drug transactions. Not only were there no subsequent drug transactions, but neither Government witness testified that the purpose of the payment was to encourage the defendant to supply more drugs. Rather, the payment was merely to satisfy a debt of a completed and, as far as the record shows, the final transaction.

As mentioned, the second of the Government's theories is that the transfer of the $2,000 completed the antecedent drug transaction, and that this completion alone is sufficient to sustain the conviction. The Government relies on three cases from other circuits in support of its position. The first of these is *United States v. Paramo,* 998 F.2d 1212 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994). In *Paramo,* the defendant embezzled IRS tax refund checks. *Id.* at 1215. Coconspirator Vega, a tax examiner for the IRS, sent fictitious refund checks to payees in New York. The defendant then picked up the checks and deposited them. *Id.* at 1215. The defendant argued that his participation in the cashing of the checks did not promote the carrying on of mail fraud. *Id.* at 1217. The Government argued that Paramo promoted mail fraud when he converted the embezzled checks into cash. *Id.*

The Third Circuit first determined that a defendant can violate the statute by engaging in financial transactions that promote not only ongoing or future activity, but, as here, prior unlawful activity. *Id.* at 1218. Since Paramo understood that the embezzled checks would have been worthless unless cashed at a bank or otherwise exchanged for negotiable currency, "the jury rationally could have found that the cashing of each check contributed to the growth and prosperity of each preceding mail fraud by creating value out of an otherwise unremunerative enterprise." *Id.*

The Government next relies on *United States v. Montoya,* 945 F.2d 1068 (9th Cir. 1991), a case cited with approval in *Paramo.* In *Montoya,* the FBI conducted a sting operation to uncover the bribery activity of the defendant, an elected official. *Id.* at 1077. The FBI undercover agent made a $3,000 payment to the defendant. The defendant deposited the check into his personal account and, on appeal, argued that the check could not have promoted the bribery because the unlawful activity was completed upon the receipt of the check from the FBI agent. *Id.* at 1076.

The Ninth Circuit disagreed, stating that the defendant could not have made use of the funds without depositing the check. *Id.* Depositing the check provided an opportunity for the defendant to carry out the illegal bribery. Therefore, the jury was presented with sufficient evidence from which to find beyond a reasonable doubt that the deposit of the check amounted to an intent to promote the carrying on of bribery. *Id.*

Finally, in *United States v. Cavalier,* 17 F.3d 90 (5th Cir.1994), the Fifth Circuit upheld the defendant's money laundering conviction based upon mail fraud. In *Cavalier,* the defendant took physical possession of a van, failed to satisfy the required monthly payments, and then sold the van for cash. Meanwhile, the defendant reported the van as stolen to the insurance company which paid off the remaining lien on the van. *Id.* at 95. The Fifth Circuit held that the transfer of a check from the insurer to the lien holder, because of the fraud of the defendant, promoted the completed mail fraud. *Id.* at 93. "Here, Cavalier caused to be reinvested or plowed back the proceeds of his mail fraud to promote his overall scheme to defraud...." *Id.*

The Government relies on the foregoing cases, and particularly on *Cavalier,* to argue that "the jury could have reasonably concluded that the defendant caused the proceeds from the drug sales to be plowed back to promote his overall scheme to possess and distribute drugs."

We find the Government's argument unpersuasive. First, in our view, *Cavalier, supra,* is distinguishable. There, the defendant fraudulently had to induce the insurance company to send a check to the credit company to cause it to extinguish its lien against his vehicle. Here, by contrast, the defendant's only crime was the consummation of the sale of ecstasy, for which he was charged and convicted. The money was picked up at the Western Union office by the defendant's wife, and placed in a box in a drawer at his home. Were the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually *every* sale of drugs would be an automatic money laundering violation as soon as money changed hands. Understood this way, § 1956 would have such reach that it

would criminalize the very same conduct already criminalized by the drug laws. The Tenth Circuit has observed in the context of a *Blockburger* challenge to a money laundering charge:

> Like the continuing criminal enterprise statute ... Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered. The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity. The Senate report on the money laundering bill makes plain that the bill was intended to create a "new Federal offense against money laundering." Sen. Rep. 99–433 at 4.... Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity." Congress enacted the money laundering statute to provide a punishment in addition to other punishment rather than instead of other punishment. We find that Congress intended money laundering and the "specified unlawful activity" to be separate offense separately punishable.

*United States v. Edgmon,* 952 F.2d 1206, 1213–14 (10th Cir.1991), *cert. denied,* ─── U.S. ───, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). Although the Tenth Circuit considered the question in a different context and perhaps placed too much emphasis on the temporal distinction between past and future crimes, its insight into Congress' intention is valuable. Congress intended to prevent an ill other than those already prohibited by other laws. The statute should not be interpreted to make any drug transaction a money laundering crime.

■ To the extent that our holding conflicts with holdings by the Third and Ninth Circuits, *see Montoya* and *Paramo, supra,* we must respectfully disagree that the mere receipt of a money transfer and the subsequent placement of cash in a box can, of itself, constitute money laundering under the statute. A holding by the Seventh Circuit, *United States v. Jackson,* 935 F.2d 832 (7th Cir.1991), is squarely consistent with our holding here. In the instant case, in the court below, the prosecution argued that the defendant could have used the funds to "turn around and buy more drugs," thereby promoting drug dealing. In *Jackson,* the Seventh Circuit described this class of money laundering offenses as "the practice of plowing back proceeds of 'specified unlawful activity' to promote that activity." *Id.* at 842. The *Jackson* defendant was convicted of money laundering under the "promoting" theory as to drug proceeds he used to purchase beepers, to buy a mobile phone, and to make rent payments, and via checks made out to cash. *Id.* at 841. With no dispute by the defendant that he knew the money was derived from unlawful activity, the court upheld his conviction as to the beepers, since there was evidence at trial that they were used to further drug activities. *Id.* As to money spent for a phone, for rental payments, and disbursed as cash however, the Seventh Circuit held the evidence insufficient because

> the government did not prove that the cellular phones played the same role—or indeed any role—in Davis's drug operations as the beepers. Likewise is the rental payments and the checks written to cash; certainly these expenditures maintained Davis' lifestyle, but more than this is needed to establish that they promoted his drug activities.

*Id.* at 841. In the instant case, the only evidence as to what was done with the money after it was sent was that it was put in a box in a drawer of the defendant's house, behavior far more innocuous than even that considered by the Seventh Circuit in *Jackson.*

There was no evidence that the money acquired through the payment was itself used to promote an unlawful activity. Following the rationale of *Jackson, supra,* we hold that the Government failed to carry its burden in proving that the defendant intends to promote unlawful activity within the meaning of the statute.

## C

■ We also must conclude that in the instant case the Government failed to sustain

its burden of proof as to Counts 6 and 8 of the indictment, for which it was required to prove that the transactions were designed, in whole or in part, to disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i). The Government's theory has been that the defendant instructed Boccia and Beck to transfer the $2,000 to his wife rather than to him in order to conceal and disguise the source and ownership of the funds from law enforcement authorities, conduct punishable under 18 U.S.C. § 1956(a)(1)(B)(i).

The only witness who testified as to the purpose for the arrangement was Stacey Maire, the wife of the defendant. She was called as a Government . witness, under a grant of immunity, and testified that the defendant asked her to pick up the funds because "he wasn't going to be around. He asked me to go for him." She also testified that in order to pick up the money orders "I needed to bring identification," and stated that "you had to prove that you were the person whose name was on the money order" and that "if they were in someone else's name, you wouldn't have been able to pick them up." Further, the Government offered a taped telephone conversation between the defendant and Beck wherein Beck indicated she was going to send the defendant some more of the money she owed him, and asked if "she should send it to Stacey again." Defendant responded, "Hum, no. You don't need to do that you know." The defense has argued that since the defendant was not going to be away at the time of the second wiring of the money, there was no reason for him to have the money sent to his wife. We are persuaded that the second conversation corroborates the prosecution witness' testimony that the $2,000 was sent in her name because the defendant would be away.

The Government introduced no other evidence tending to show that the defendant had the purpose of concealing the money sent to him by the co-conspirators.

The record clearly shows that the wiring of the money to the defendant's wife was for the purpose of convenience and not concealment. While the evidence was no doubt sufficient to show that the money which was paid was the proceeds of illegal activity, the Government did not present evidence to show intent to conceal the funds or evidence to prove promotion of another illegal activity. Consequently, we now reverse the defendant's money laundering conviction on Counts 6 and 8.*

## IV

The defendant has raised several other issues on appeal concerning evidentiary rulings by the district court. Discussion of these rulings, including the district court's denial of the defendant's request of possible Jencks Act material, would add little to the explanations given by the district court. We find that it acted well within its discretion in its decisions on these matters.

Accordingly we now reverse Counts 2, 5, 6, 7, and 8 and affirm on all other grounds of appeal.

Accordingly, the judgment is

*REVERSED IN PART AND AFFIRMED IN PART.*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

With respect to Ira Heaps' convictions on Counts 5 and 7 of the indictment, Part III B of the majority opinion concludes that the government failed to carry its burden of proving that Heaps engaged in a financial transaction with intent to promote unlawful activity within the meaning of the money laundering. statute, 18 U.S.C. § 1956(a)(1)(A)(i). For the reasons that follow, I dissent from that portion of the opinion. In all other respects, I concur.

A jury convicted Heaps on Counts 5 and 7 of the indictment for money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Count 5 alleges that on November 13, 1991, Gillian Beck transferred $1,500 by wire to

---

* In addition, since the money laundering convictions are reversed, the conviction on Count 2 of conspiracy to launder money is also reversed.

Heaps "with the intent to promote the carrying on of such specified unlawful activity [illegal drug distribution]," and Count 7 alleges a similar transaction on the same date in the amount of $500. Our review, therefore, must take the facts presented to the jury in the light most favorable to the government and determine whether a reasonable jury could convict the defendant under the applicable standard of proof. I conclude that ample evidence supported the jury's verdict of conviction on those two counts and would therefore affirm.

Beginning in June 1991 and continuing until November 1991, Heaps, who was located in New York City, was the regular supplier of the illegal drug "ecstacy," which is sold in tablets or pills, to Gillian Beck and Geoffrey Boccia, who were located in the Washington, D.C. area. Beck and Boccia bought the drugs, often on consignment, and sold them to customers in small portions. Beck, a friend of Heaps, visited him in New York City regularly and even travelled with him to Jamaica at Heaps' expense on two occasions. Typically, Beck and Boccia paid for a portion of the tablets or other drugs in advance and remitted the balance owed from the profits after the drugs were sold.

Indeed, the payments of $1,500 and $500 in November 1991 were derived from the proceeds of drug sales and were remitted to Heaps to cover the balance of the amounts owed to him for previous drug purchases. On Heaps' instructions, Beck wired the $2,000 at 11:25 p.m. on November 13, 1991, via Western Union to Stacy Maire, Heaps' girlfriend. Maire then cashed the money orders and placed the cash in the "money box" in Heaps' apartment.

Heaps does not dispute that the jury could conclude that the November money orders were the proceeds of illegal drug activities sent by wire in interstate commerce and that Heaps knew of the illegal nature of the proceeds. The point Heaps does argue is that he did not engage in the financial transactions "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i).

Heaps argues, and the majority opinion agrees, that this transaction was nothing more than a payment for drugs. The majority notes, "Were the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually *every* sale of drugs would be an automatic money laundering violation as soon as money changed hands." *Cf. United States v. Edgmon,* 952 F.2d 1206, 1213 (10th Cir. 1991) ("Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered.")

While I agree that the payment *constituting a drug violation* cannot serve as the basis for money laundering, that does not mean that a financial transaction after completion of the illegal drug activity, even if closely connected, cannot constitute money laundering. A violation of 18 U.S.C. § 1956(a)(1)(A)(i) requires a "financial transaction" (1) *that is not necessary* to the establishment of the underlying illegal activity; and (2) that supports or promotes the illegal activity.* This is typically revealed by evidence that the proceeds of a drug sale are "plowed back" into the purchase of drugs or equipment or in other ways used to continue the illegal conspiracy. *See United States v. Jackson,* 935 F.2d 832, 841–42 (7th Cir.1991). Additionally, in circumstances where nonmonetary proceeds are received in the form of a security, a violation may occur when the security is converted (by a financial transaction) into money, thereby yielding a benefit by a transaction which is distinct from the independently illegal underlying activity.

In this case, the most obvious demonstration of money laundering is the loan payback by Beck to Heaps which, in effect, continued the credit arrangement that facilitated the underlying illegal drug conspiracy. While there is no direct evidence that the $2,000 was actually "plowed back" into the illegal drug activity, the circumstantial evidence clearly supports the conclusion that the $2,000 supported an ongoing drug conspiracy

---

* Cashing a money order falls within the definition of "financial transaction" because it involves "the movement of funds by wire or other means." 18 U.S.C. § 1956(c)(4)(A)(i).

through a "fronting" scheme by which Heaps distributed drugs to Beck and Boccia. Without the $2,000 payment, such a scheme would not have continued. The $2,000 payment satisfied a credit arrangement agreed to as part of the "fronting" scheme. The jury was presented with evidence of similar prior and subsequent transactions and could well have concluded that the $2,000 promoted the scheme which had been in existence for the entire summer and fall of 1991. Significantly, after her arrest in January 1993, Beck placed an undercover telephone call to Heaps in which the two coordinated the next installment of money owed for previously completed drug transactions, thus demonstrating the ongoing nature of their financial arrangement. In similar circumstances, the Second Circuit concluded, in *United States v. Skinner*, 946 F.2d 176 (2nd Cir.1991), that the purchase of U.S. Postal Service money orders from the proceeds of drug sales and the transmission of those money orders to the drug supplier constituted money laundering because that financial transaction facilitated the drug conspiracy. *Id.* at 177–78.

Although the above evidence is sufficient to support the jury's verdict on the money laundering counts, I note that the verdict is further buttressed by the transaction with Western Union, which was (1) separate from the necessary elements of the drug violation and (2) supported it. In November 1991, after she had already received and distributed drugs, Beck transferred cash in Washington, D.C. to Western Union in exchange for a promise that Western Union pay cash in New York to a designated payee, i.e. Stacy Maire. This commercial transaction was more than the payment of money for drugs; it was a "financial transaction" in the private sector which fully supported the ongoing drug conspiracy, but was not necessary to establish the drug violation. Similar conclusions have been reached in somewhat distinguishable but no less apposite factual circumstances by the Third, Fifth, and Ninth Circuits. *See United States v. Paramo*, 998 F.2d 1212 (3rd Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994); *United States v. Cavalier*, 17 F.3d 90 (5th Cir.1994); and *United States v. Montoya*, 945 F.2d 1068 (9th Cir.1991). In each of these cases, the defendants fraudulently ob-

tained checks which they cashed to realize the benefits of their illegal conduct, and in each, the court held that by showing that the checks were cashed, money laundering had been established. As the court in *Paramo* said:

> In the present case, Paramo understood that the embezzled checks would have been worthless unless cashed at a bank or otherwise exchanged for negotiable currency. Given this fact, the jury rationally could have found that the cashing of each check contributed to the growth and prosperity of each preceding mail fraud by creating value out of an otherwise unremunerative enterprise.

998 F.2d at 1218. Similarly, in this case Beck created a fund with Western Union on which Heaps (through his girlfriend) drew to obtain cash in furtherance of his credit arrangement with Beck and Boccia.

The lifeblood of any business is the resupply of capital, particularly when credit is extended, and for this reason, I conclude that the evidence was sufficient to allow a jury to conclude that the $2,000 money-order transactions between Beck and Heaps on November 13, 1991, promoted the carrying on of the alleged illegal drug conspiracy and therefore violated 18 U.S.C. § 1956(a)(1)(A)(i).

I would therefore affirm the Heaps conviction under Counts 5 and 7 of the indictment, and, with respect to the majority's decision on those counts, I respectfully dissent.