**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                  No. 98-4033

JOEL ROSS GOHEEN,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Thomas A. Wiseman, Jr., Senior District Judge,
sitting by designation.
(CR-97-86)

Argued: December 4, 1998

Decided: March 18, 1999

Before MICHAEL and MOTZ, Circuit Judges, and
GOODWIN, United States District Judge for the
Southern District of West Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Aaron Edmund Michel, Charlotte, North Carolina, for
Appellant. Brian Lee Whisler, Assistant United States Attorney,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Cal-
loway, United States Attorney, Charlotte, North Carolina, for Appel-
lee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Joel Ross Goheen was convicted by a jury of eleven counts of wire fraud in violation of 18 U.S.C. § 1383 (1994) and of eighteen counts of money laundering in violation of 18 U.S.C. § 1956 (1994). Senior United States District Judge Thomas A. Wiseman, Jr., sitting in the Western District of North Carolina, sentenced Goheen to seventy-eight months imprisonment. Goheen appeals both his conviction and sentence. Finding no error, we affirm.

I.

In early 1995, the Securities and Exchange Commission imposed a Cease and Desist Order on Goheen, restricting his activities in Florida regarding the sale of "partnership trust units" and other investment vehicles concerning JRG Trust Corporation and Shuttle America. Shortly thereafter, Goheen moved to Charlotte, North Carolina, where he began promoting other investment opportunities-- electronic ticketless travel and reservation systems named AirCard and TransVia -- to his new Charlotte acquaintances. The first of these new "friends" that Goheen approached was Louis Hickman, with whom Goheen had entered into a lease-purchase agreement on a 4500-square-foot home for his family.

Goheen represented to Hickman that his successful AirCard venture was providing him with a monthly income of $10,000 and that the TransVia product was close to fruition. Goheen convinced Hickman to invest $200,000 in the TransVia concept. In return, Goheen promised to pay Hickman $300,000 in December 1995 and $3,000 in monthly interest until then. On April 11, 1995 and again on May 5, 1995, Hickman presented Goheen with checks for $100,000 which Goheen negotiated at a local bank and wired to his accounts in Maine and Iowa. Goheen thereafter spent Hickman's money primarily on personal items and on interest payments to Hickman.

2

As Goheen's money supply drew short, he approached fellow church parishioner Ken Austin. Goheen represented himself to Austin as a retired real estate magnate and world traveler who had previously dabbled in the sales and leases of jets and who had owned Lamborghinis, Porsches, and Rolls Royces. In September 1995, Goheen informed Austin that TransVia would be a major money maker in six months. Goheen promised to repay $150,000 in six months, plus $1,500 in monthly interest, if Austin would invest $100,000. Austin agreed, and Goheen again spent the majority of the funds on personal items as well as on interest payments to Hickman and Austin.

Time passed and Goheen's cash position again grew troublesome. In addition, Goheen's prior business dealings in Florida began receiving some publicity. Fearing that Austin would see the reports, Goheen called Austin from Florida in January 1996 and confessed that the FBI was questioning him about the failed Shuttle America airline venture. Two months later, the month that Austin was expecting to receive the $150,000 return on his investment, Goheen again called, this time to inform Austin that he would need to borrow more money or that Austin's entire investment would be lost. In April, Austin provided $13,000 to Goheen upon Goheen's guarantee that he would return the money in two weeks. Goheen never returned the $13,000, although he continued to make interest payments to both Hickman and Austin.

In July 1996, Goheen approached another parishoner, Greg Eichman. Again, Goheen held himself out to be a wealthy, stable businessman, who had enjoyed a successful financial career. Goheen told Eichman that TransVia would be operational in about a month and that there would be no risk to loaning Goheen $50,000 for business expenses. Again, Goheen promised an incredible return, offering to repay $100,000 in six months. Eichman agreed.

In September 1996, Goheen's monthly payments to Austin ceased. Austin had been using the money to satisfy the monthly payments on a second mortgage that he had taken out to invest in Goheen's ventures. By that time, Goheen had depleted the entire $369,000 in funds that he had received from Hickman, Austin, and Eichman.

In April 1997, a federal grand jury indicted Goheen on counts of wire fraud and money laundering. He was convicted by jury on all

3

counts and sentenced to a term of imprisonment of seventy-eight months.

In this appeal, Goheen alleges several errors by the district court. We consider each in turn.

II.

In order to prove wire fraud under 18 U.S.C. § 1383, the government must establish the following elements: 1) a scheme to defraud and 2) use of a wire communication in furtherance of the scheme. United States v. Loayza, 107 F.3d 257, 260 (4th Cir. 1997). Goheen argues that the evidence was insufficient to satisfy either element. We disagree.

A.

A "scheme to defraud" is "any scheme to deprive another of money or property by means of false or fraudulent pretenses, misrepresentations or promises." Carpenter v. United States, 484 U.S. 19, 27 (1987). The defendant argues that the evidence presented at trial is insufficient to constitute a "Ponzi" scheme. [1] However, section 1383 requires proof only of any scheme to defraud, not simply "Ponzi" schemes. Thus, we review the evidence to decide whether any rational trier of fact could have found that there was a scheme to defraud without regard for whether the jury could have found a"Ponzi" scheme. See United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir. 1995) (setting forth standard of review when appeal challenges sufficiency of evidence).

There was ample evidence at trial to prove a scheme to defraud. The jury could have found that Goheen made several material misrepresentations to his victims during the course of his scheme, including that 1) he was wealthy and retired; 2) TransVia was an operating system generating revenue; 3) he had a highly successful business

_____

[1] A "Ponzi" scheme is one in which investors are paid off with money received from later investors in order to prevent discovery and to encourage additional investments. See United States v. Loayza, 107 F.3d 257, 259 (4th Cir. 1997).

4

record; 4) his requests for investments were not for personal expenses, but were merely generous offers to assist his friends; 5) he owned his home free and clear; 6) he was a software designer; 7) he was earning $10,000 per month from AirCard; 8) he had contracts in place to use his TransVia system; 9) a computer company, Muscato, had invested $1 million in research and development; 10) there was no risk involved in the loans made; 11) a business named ACS was contracted to handle the hardware and software for TransVia after the agreement with Muscato fell through; 12) TransVia was on the verge of becoming fully operational; and 13) patent approval was imminent. Further, the jury could have found that Goheen falsely represented to his victims that his proposed investment vehicles were on the verge of growing into booming businesses when in fact they were nothing more than concepts. The jury also could have found that Goheen used an extremely high percentage of the investments he received for personal expenses, not business expenses. Clearly, the evidence was sufficient to support the jury's conclusion that Goheen participated in a scheme to defraud.

B.

Goheen also argues that the evidence was insufficient to prove that he used a wire communication in furtherance of his scheme. Section 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of a wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sound for the purpose of executing such scheme or artifice, shall be [guilty of wire fraud].

Id. (emphasis added). Goheen admits that some of his transactions involved wire transfers, but he argues that the transfers occurred after the checks were received; thus, the wire was not used for the purpose of executing a fraud.[2]

_____

**2** On at least one occasion, Goheen directed his victims to wire money directly into his account in Maine or Iowa rather than simply receiving a check.

5

The use of a wire transfer need not be an essential element of the scheme to defraud, Schmuck v. United States, 489 U.S. 705, 710 (1989) (citing Pereira v. United States, 347 U.S. 1, 8 (1954)), but must be at least "incident to an essential part of the scheme" or "a step in [the] plot." Id. at 710 (quoting Badders v. United States, 240 U.S. 391, 394 (1916)). "The relevant question at all times is whether the [wiring] is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the[wiring] later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." Id. at 716.

The wire communications involved here were part of the overall scheme. Goheen used wire transfers to convert bank drafts into credited cash in his account. It was only after Goheen or his victims wired the funds into his out-of-state accounts that Goheen could then begin paying interest on the investments and complete the fraud.

The facts here are similar to those before the Supreme Court in Pereira v. United States. In Pereira, the defendant was charged with having defrauded a wealthy widow of her property after marrying her. The Court described the conduct of defendant as follows:

> Pereira asked his then wife if she would join him in the hotel venture and advance $35,000 toward the purchase price of $78,000. She agreed. It was then agreed, between her and Pereira, that she would sell some securities that she possessed in Los Angeles, and bank the money in a bank of his choosing in El Paso. On June 15, she received the check for $35,000 on the Citizens National Bank of Los Angeles from her brokers in Los Angeles, and gave it to Pereira, who endorsed it for collection to the State National Bank of El Paso. The check cleared, and on June 18, a cashier's check for $35,000 was drawn in favor of Pereira.

Pereira, 347 U.S. at 5.

Although Pereira did acquire the check directly from his victim and could presumably have converted the check to cash using other means, the Supreme Court determined that use of the mails was "a significant part in enabling the defendant in that case to acquire

6

dominion over the $35,000, with which he ultimately absconded."
United States v. Maze, 414 U.S. 395, 401 (1974) (discussing Pereira).
The Court later explained,

> While it is clearly implied in this Court's opinion in Pereira
> that the El Paso bank did not immediately credit the account
> of the defendant, but instead awaited advice from the Los
> Angeles bank to which it had mailed the check, the opinion
> of the Court of Appeals for the Fifth Circuit in Pereira
> makes that fact abundantly clear:

> The return of (the) check from Texas to California
> constitutes the mailing referred to in the First
> Count . . . . In mailing the check back to the bank
> in California on which it was drawn, the El Paso,
> Texas, bank sent "instructions to wire fate", mean-
> ing to wire whether the item was paid or not. Upon
> receiving a telegram stating that the check had
> been paid, the bank in El Paso gave Pereira its
> cashier's check for $35,286.01, which Pereira
> promptly cashed on June 19, 1951.

Id. at 401.

Similarly, we find that although Goheen conceivably could have
converted the bank drafts into cash through means other than the use
of wire transfers, the use of the wire played "a significant part in
enabling [Goheen] to acquire dominion over the[money]." See id. We
therefore find that there was sufficient evidence to support the jury's
finding that Goheen used wire communications in furtherance of his
scheme to defraud.

III.

The money laundering statute subjects to punishment

> [w]hoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlaw-
> ful activity, conducts or attempts to conduct such a financial

7

> transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity.

18 U.S.C. § 1956 (a)(1)(A)(i). Subsequently, the statute defines "specified unlawful activity" to include "wire fraud." See 18 U.S.C. §§ 1956(c)(7)(A), 1961(a). Goheen argues that the evidence was insufficient to support his conviction for money laundering. For this proposition, the defendant relies heavily -- if not exclusively -- on United States v. Heaps, 39 F.3d 479 (4th Cir. 1994).**3**

Heaps rests on the insufficiency of the evidence as it relates to the third element of the money laundering statute. Heaps had been convicted of supplying a controlled substance to two people who sent payments by wire. The money sent to Heaps was not used to promote unlawful activity. Rather, "the only evidence as to what was done with the money after it was sent was that it was put in a box in a drawer of the defendant's house." Id. at 486.

Heaps distinguishes the receipt of monies that are the proceeds of the underlying offense but which have nothing further to do with the criminal conduct from those receipts which promote the carrying on of specified unlawful activity. Only the latter receipts constitute money laundering. If the Heaps defendant had taken the proceeds of his sale and had illegally purchased additional drugs for future illegal drug sales, there is no doubt that the court would have upheld a money laundering conviction for that activity. Id. Because the Heaps defendant did not use his proceeds in a way related even tangentially to his drug sales, the Heaps court held that the government had not proved that the defendant violated the statute.

Here, Goheen concedes that the proceeds received as a result of his wire fraud were used to pay "interest" to the victims of his fraud --

_____

**3** Goheen also relies on Heaps to support his argument that the fraudulent activity in the wire fraud count cannot also form the basis of the money laundering count. This argument fails. "That the transactions were part of the overall scheme to defraud or could form the basis of a wire fraud charge is of no consequence." United States v. Wilkinson, 137 F.3d 214, 221 (4th Cir. 1998).

8

payments that were part of the fraudulent conduct. The jury could have found that Goheen's act of paying his victim's interest with the proceeds of his fraud promoted his scheme. Such activity is far from merely placing the proceeds in a box and is certainly sufficient to support his conviction for money laundering.

IV.

Goheen next argues that the sentencing court improperly groups the amount of "funds" involved in Goheen's money laundering conviction with the amount of "loss" attributable to Goheen's wire fraud conviction.

Goheen admits that the method used by the sentencing court was not error pursuant to United States v. Walker , 112 F.3d 163 (4th Cir. 1997).**4** Goheen argues, however, that Walker was incorrectly decided. We disagree.

Following Walker, wire fraud and money laundering counts are grouped if the offenses are "closely related." Id. at 167. The sentencing court specifically considered the offenses and found them to be closely related. We find no error in the court's determination.

V.

Finally, Goheen argues that the sentencing court erred by departing upward from criminal history category I to criminal history category III on the basis of Goheen's foreign convictions.

Foreign sentences may not be used in computing a criminal history category. U.S. SENTENCING GUIDELINES MANUAL § 4A1.2(h) (1997). However, the court may depart from the Guidelines pursuant to the policy statement contained therein if reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's prior conduct or the probability of recidivism. Id. § 4A1.3. Such information may include, but is not limited

_____

**4** Goheen attempts in his reply brief to distinguish Walker from the present facts. We find no merit in his argument.

9

to, information concerning prior sentences not used in computing the criminal history category. Id. § 4A1.3(a); United States v. Rusher, 966 F.2d 868, 881 (4th Cir. 1992).

Goheen argues that the district court did not have sufficiently reliable information from which it could conclude that the criminal history category did not adequately reflect the seriousness of his past criminal conduct. However, the presentence investigation report and testimony reflected that the defendant had been convicted in Canada. Additionally, Goheen, in his objections to the presentence investigation report, himself reported that "Mr. Goheen entered a guilty plea to two counts of fraud [in Canada] in order to take responsibility for the losses to investors in the real estate venture. He was not found guilty by a jury."

Goheen next argues that if the sentencing court properly used foreign sentences in calculating the criminal history, then it miscalculated that history by failing to apply U.S.S.G.§ 4A1.2(a)(2) dealing with related cases. Of course, the application of Section 4A1.2(a)(2) is an application of the Guidelines, and the use of the foreign sentences is a departure therefrom. When departing from the Guidelines, the sentencing court is not constrained to return to the Guidelines.

Finally, the defendant argues that the district court failed to consider a one-level departure, rather than a two-level departure. In United States v. Rusher, 966 F.2d 868, 884 (4th Cir. 1992), we vacated a sentence when the district court failed to consider an intermediate-level departure before setting a multiple-level departure to prevent judges from employing unwarranted departures. See also United States v. Cash, 983 F.2d 558, 561 (4th Cir. 1992); United States v. Lawrence, 161 F.3d 250, 256 (4th Cir. 1998). In this case, the district court matched the defendant's criminal history precisely to what the district court believed the defendant's criminal history category would have been with the Canadian convictions included, thereby explaining why a one-level departure was inadequate. Unlike those cases in which the sentence is properly vacated, see United States v. Harrison, 58 F.3d 115, 118 (4th Cir. 1995) (vacating sentence when "there is not even a hint in the record that the district court attempted to comply with the procedural dictates that we explicitly outlined in Rusher"), the record here clearly reflects the basis for the

10

levels of departure and provides sufficient reasons for the decision. We find no error.

VI.

Goheen's conviction and sentence are

AFFIRMED.