**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Troy Anthony EDWARDS,
Defendant-Appellant.**

No. 97–30192.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1998.

Decided June 23, 1998.

Amended Aug. 7, 1998.

Robert Gombiner, Assistant Federal Public Defender, Tacoma, Washington, for defendant-appellant.

Bruce Miyake, Assistant United States Attorney, Seattle, Washington, for plaintiff-appellee.

Before: HUG, Chief Circuit Judge, REINHARDT, Circuit Judge, and REED, Senior District Judge.*

## ORDER

The opinion filed June 23, 1998 (Slip op. at 6333) is amended and the amended opinion is filed contemporaneously with this order. Because the amendments are non-substantive, no new petition for rehearing or suggestion for rehearing en banc may be filed.

## OPINION

REINHARDT, Circuit Judge:

Troy Anthony Edwards appeals his conviction on one count of possession of cocaine with intent to distribute. 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A). Edwards asserts that the Assistant United States Attorney improperly continued to serve as the prosecutor notwithstanding the fact that in the middle of trial he personally found a key piece of physical evidence, the existence of which was previously unknown to all parties, and the circumstances surrounding his discovery necessarily became the subject of inquiry and contention during the remainder of the trial. Because we conclude that the prosecutor's continued representation of the government constituted a form of improper vouching that affected the fundamental fairness of Edwards's trial, we reverse.

## I. BACKGROUND

In January 1995, police officers in Tacoma, Washington responded to a report of domestic violence. The first officer who arrived at the house that was the scene of the altercation observed Edwards in a car pulling out of the driveway into a parking space on the side of the house. When the rest of the officers arrived, Edwards stepped out of the car and walked toward them. He was immediately arrested on suspicion of assault. The officers then turned their attention to the victim, Carbenia Grimes, who had been standing on the front porch of the house. She was bleeding from the head and was very upset. After the officers assured her that Edwards was in custody, she explained that she had been struck in the head with a handgun. Once Grimes had been treated for her injuries, the officers proceeded to conduct a more thorough interview, during which she informed them that after Edwards had hit her, she observed him leaving the house with the gun and a black nylon bag.

On the basis of this information, the police obtained a warrant to search the car that Edwards had been in when the police arrived; they were looking for the gun that had been used in the assault. During their search, they discovered in the trunk of the car a black nylon bag containing what appeared to be crack cocaine. The officers obtained a second warrant authorizing a search for narcotics. In the bag, they found seven kilograms of cocaine, and in the car, which was registered to another person, they found a manila file with documents bearing Edwards's name, two cellular phones, and material that had been used to wrap the individual kilograms of crack. The firearm was never recovered. During a search of Edwards's home, the officers did not find any drugs, but found a few items consistent with drug trafficking, including several scales and some wrapping material.

Edwards was charged with possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A). He pleaded guilty and received a sentence of 240 months, the statutory minimum. Prior to sentencing, the district court denied Ed-

* The Honorable Edward C. Reed, Senior United States District Judge for the District of Nevada, sitting by designation.

wards's motion to withdraw his plea. On appeal, however, his plea and conviction were vacated because the district court failed to inform him of either the statutory minimum sentence for the offense or the nature of the charges against him, in violation of Fed. R.Crim.P. 11(c).

Edwards's case was remanded to the district court on January 9, 1997. One month later, the district court notified the parties that a jury trial had been scheduled for March 17. On March 11, Edwards appeared and withdrew his guilty plea. The government reindicted him on March 13. The trial was subsequently rescheduled for May 5. Because each side was represented by new counsel, the parties jointly sought a continuance of that trial date on April 28. The district court refused their request and Edwards's two-day trial began a week later.

After the jury was sworn in, the district court held a suppression hearing for purposes of determining, among other things, the admissibility of statements Grimes made to the police after she had been treated by the medical aid unit. Of particular interest were Grimes's statements that she had seen Edwards leave the house with the gun *and* a black bag. Grimes was unwilling to testify, however, and without these statements, the prosecution had only circumstantial evidence tying Edwards to the black nylon bag—his fingerprints were not found either on the bag or on its contents. Although the government contended that Grimes's statements fell under the excited utterance exception to the general rule against the admissibility of hearsay, the district court found that sufficient time had elapsed between the assault and the statements to deprive the statements of their spontaneous nature.

Notwithstanding the court's earlier ruling, evidence of Grimes's statements made it into evidence during the testimony of Officer Patrick Stephen, one of the police officers who had interviewed Grimes. On cross-examination, defense counsel engaged in the following exchange with Officer Stephen:

DEFENSE: So basically your contacts [were] more with the person who [had] allegedly been assaulted, Ms. Grimes, correct?

OFFICER: Yes, it was.

DEFENSE: It's true one of your concerns was where a gun might be?

OFFICER: Yes.

DEFENSE: It's a fact, is it not, that you were not able to determine from Ms. Grimes anything precise about what she had observed with respect to where that gun had ultimately gone; is that correct?

OFFICER: That's correct.

On the basis of this line of questioning, the district court determined that defense counsel had "opened the door" to Grimes's statements and accordingly permitted the prosecution, on redirect, to elicit detailed testimony regarding the statements, including testimony that Grimes had said that she saw Edwards leave the house with a black nylon bag. Defense counsel vigorously objected to the admission of the black bag testimony.[1]

On the first day of trial, the prosecution introduced the black bag and the cocaine into evidence. The witness through whom the bag was introduced, one of the police officers who had been present during the search of the car, testified that there was nothing in the bag that established the identity of its owner. Accordingly, the principal evidence tying Edwards to the bag—aside from the challenged hearsay testimony—was the fact that it was found in the car that he was driving when the police officers arrived at the scene. That night, however, defense counsel received a telephone call from the Assistant United States Attorney who was prosecuting the case, informing him of a new piece of evidence that he had allegedly just discovered. The prosecutor told defense counsel that he had been inspecting the black bag in the presence of two police officers, and had looked under a piece of cardboard

---

1. On appeal, Edwards's counsel challenges the district court's ruling that he "opened the door." Because we dispose of this case on the basis of improper prosecutorial vouching, we need not decide the issue.

that served as support for the bottom of the bag and found a bail receipt bearing Edwards's name. The bag had been in the custody of the Tacoma police (along with the cocaine) for the two years preceding the trial, but no one had previously discovered the receipt.

The next day in court, defense counsel moved to exclude the receipt, arguing that Edwards's right to a fair trial was being threatened because the opening defense statement, as well as the entire defense theory, had been premised on the fact that there was no evidence providing a direct link between Edwards and the bag. In addition, defense counsel argued that the prosecutor's discovery of this evidence created a problem under the advocate-witness rule because he would then be required to serve as both prosecutor and witness. Specifically, defense counsel argued:

> This is going to put us in a position where [the prosecutor] is going to be functioning in some kind of dual capacity here, as both an advocate and a witness, which we believe is highly improper and is going to impinge on the defendant's right of Sixth Amendment confrontation.
>
> Whether or not he testifies here, it's a big problem because we have [the prosecutor] being the discoverer of the evidence, not going to be subject to cross-examination on the issue. And whether he testifies or not, he's in effect going to be kind of a silent witness vouching for the authenticity of this piece of evidence before a jury in a case in which he's trying it before this jury.

The district court refused to exclude the evidence, on the ground that the prosecutor's testimony was not necessary as there were two other witnesses who could testify regarding his discovery of the receipt and that the advocate-witness rule was therefore not applicable. The district court also refused defense counsel's motions for a mistrial and, in the alternative, a continuance that would allow him to look into the legitimacy of the newly discovered evidence and the circumstances under which it was discovered.

Following these rulings, the receipt was introduced into evidence through the same police officer who had earlier testified that there was nothing in the bag linking it to Edwards. The prosecutor had replaced the receipt in the bottom of the bag and asked the officer, who had not been present when he found the evidence, to look under the cardboard. By doing so, the prosecutor presented to the jury a re-enactment, albeit undisclosed, of his own discovery of the evidence with the witness playing his role. The prosecutor directed the scene, first instructing the officer to pull up the cardboard "and see if there is anything underneath it." Defense counsel objected, but the objection was overruled. The following testimony then transpired:

> OFFICER: There's some paperwork, some rubber bands, a Benadryl.
>
> A.U.S.A.: What do you have in your hand there?
>
> OFFICER: This is a Tacoma Municipal Court receipt.
>
> A.U.S.A.: Whose name?
>
> OFFICER: Edwards, Troy Anthony.

On cross-examination, the officer admitted that he had not seen the receipt during his prior search of the bag.

Testimony regarding the circumstances of the discovery of the receipt was then elicited from the two police officers who had been present when the prosecutor found it. First, Officer Frank Richmond testified in response to defense questioning as follows:

> DEFENSE: You were present at a time when a document was supposedly found in this bag; is that right?
>
> OFFICER: I was present when it was found, yes.
>
> DEFENSE: Where exactly were you when the document was found?
>
> OFFICER: Myself, [the prosecutor] and Officer Lowry, we were in a conference room of the United States Attorney's Office downstairs, and [the prosecutor] was examining the bag and the bottom of the bag. He was looking down there.

There was a little strip of paper, a cardboard wrapping of some sort, a broken rubber band, and there was a gummy bear. He removed the small wad of paper, opened it in my presence, and there was a receipt with the name of Troy Edwards on it.

On redirect, Officer Richmond testified that the black bag had been stored in the evidence room until Edwards's trial. The prosecutor then asked him the following questions regarding the receipt:

A.U.S.A.: Yesterday when the bag was being examined, that was the first time that you had an opportunity to look at it?

OFFICER: Yes.

A.U.S.A.: To your knowledge, it was the first time that anyone else present, including myself, had an opportunity to look at it?

OFFICER: As far as I know.

A.U.S.A.: *That wasn't planted there, was it?*

OFFICER: *Absolutely not.*

A.U.S.A.: That was found by looking underneath the bottom of the bag that kind of pulls up?

OFFICER: Yes.

Next to testify about the bag and the receipt was Officer Lowry. As the case agent, Officer Lowry was seated next to the prosecutor throughout the trial and he had also been present when the prosecutor found the receipt. Regarding the receipt, Officer Lowry and the prosecutor engaged in the following exchange:

A.U.S.A.: Who examined the bag down at the U.S. Attorney's Office?

OFFICER: The bag was examined by the [Assistant] U.S. Attorney in the presence of myself and Officer Richmond.

A.U.S.A.: At that time, was anything found in the bag?

OFFICER: Yes, sir, it was.

A.U.S.A.: What was that?

OFFICER: The [Assistant] U.S. Attorney, yourself, sir, pulled the board or whatever it is at the bottom up, and first found, I think it was like a pen or a stationary [sic] container that had the name of a—it was empty, but it had like a price tag from some unknown store on it, and then some little pieces of, like, paper from an antihistamine or a cold tablet was in there. I believe it was an old piece of candy that looked like it had slipped under there a long time ago and was partially melted, and a wound up small piece of paper.

A.U.S.A.: What happened after that was discovered?

OFFICER: You unwrapped the paper and saw that it was a receipt of some sort from Tacoma Municipal Court.

A.U.S.A.: After that was done, what happened then?

OFFICER: I looked at the receipt. Myself and Officer Richmond looked at it at the same time when you found it.

A.U.S.A.: Had you ever seen that receipt before Monday May 5?

OFFICER: No, sir.

A.U.S.A.: When is the first time you saw it?

OFFICER: When you pulled it out of the bottom of the bag, sir.

During closing arguments, the prosecutor identified the receipt as a key piece of evidence and noted that it was "the closest thing to a smoking gun that ties the defendant to the bag." In turn, defense counsel attempted to cast doubt on the circumstances surrounding the discovery of the receipt. In response to the argument that the discovery of the receipt was suspicious, the prosecutor spent most of the rebuttal portion of his closing argument trying to convince the jury that the receipt had not been planted and that the evidence was reliable. The prosecu-

tor observed that the defense's accusation about planting the receipt demonstrated both the desperation of the defense and the importance of the evidence. The prosecutor contended, for example:

> The only thing they can argue—they cannot contest the fact that there is this receipt with this man's name on it, which closely ties him to that bag, along with all of the other circumstances, so what do they say? Their hand is caught in the cookie jar, so they submit it is planted.

He also asserted: "That receipt found in that bag cannot be denied, that's why they are hollering and screaming about it so bad."

The jury returned a guilty verdict and Edwards was sentenced to a 262–month term of imprisonment, almost two years more than he had received following his plea of guilty.[2]

## II. DISCUSSION

On appeal, Edwards contends, *inter alia*, that the district court should have either excluded evidence of the bail receipt or granted his request for a mistrial. He asserts, as he did in the district court, that the prosecutor's continued representation of the government constituted improper vouching. We agree that the prosecutor's continued performance of his role as prosecutor in this case violated the principles upon which both the rule against prosecutorial vouching and the advocate-witness rule are based.

 It is well settled that a prosecutor in a criminal case "has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions of personal knowledge.'" *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). A prosecutor may not impart to the jury his belief that a government witness is credible. *United States v. McKoy*, 771 F.2d 1207, 1210–11 (9th Cir. 1985). Such improper vouching may occur in at least two ways. The prosecutor may either "place the prestige of the government behind the witness or ... indicate that information not presented to the jury supports

the witness's testimony." *Roberts*, 618 F.2d at 533. When the credibility of witnesses is crucial, improper vouching is particularly likely to jeopardize the fundamental fairness of the trial. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991).

 Akin to the rule against vouching is the advocate-witness rule, under which attorneys are generally prohibited from taking the witness stand to testify in a case they are litigating. *See United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir.1985). As with vouching, the policies underlying the application of the advocate-witness rule in a criminal case are related to the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors. Moreover,

> the rule reflects a broader concern for public confidence in the administration of justice, and implements the maxim that "justice must satisfy the appearance of justice." This concern is especially significant where the testifying attorney represents the prosecuting arm of the federal government.

*United States v. Johnston*, 690 F.2d 638, 643 (7th Cir.1982) (footnote omitted); *see also Prantil*, 764 F.2d at 553 ("the rule expresses an institutional concern, especially pronounced when the government is a litigant, that public confidence in our criminal justice system not be eroded by even the appearance of impropriety"). Essentially, the danger in having a prosecutor testify as a witness is that jurors will automatically presume the prosecutor to be credible and will not consider critically any evidence that may suggest otherwise. And, as the Eleventh Circuit has observed, the policies underlying the advocate-witness rule:

> apply equally when a prosecutor implicitly testifies to personal knowledge or otherwise attains "witness verity" in a case in which he appears as an advocate for the government. Thus, it would be improper for a government attorney who has independent personal knowledge about facts

---

2. The increased sentence resulted from the district court's determination that Edwards was eligible for a sentencing enhancement pursuant to 21 U.S.C. § 851.

that will be controverted at the trial to act as prosecutor (1) if he uses that inside information to testify indirectly by implying to the jury that he has special knowledge or insight, or (2) if he is selected as prosecutor when it is obvious he is the sole witness whose testimony is necessary to establish essential facts otherwise not ascertainable.

*United States v. Hosford,* 782 F.2d 936, 939 (11th Cir.1986).

 From the cases on vouching and the advocate-witness problem, it is clear that both of these rules were designed to prevent prosecutors from taking advantage of the natural tendency of jury members to believe in the honesty of lawyers in general, and government attorneys in particular, and to preclude the blurring of the "fundamental distinctions" between advocates and witnesses. *Prantil,* 764 F.2d at 554. As we have made clear, "enforcement of the[se] rule[s] is a matter of institutional concern implicating the basic foundations of our system of justice." *Id.* at 553. Although the circumstances of this case do not fit neatly under either the advocate-witness rule or the vouching rule, there can be no question that the policies underlying both rules were directly contravened by the prosecutor's continued representation of the government in Edwards's criminal prosecution. Once the members of the jury learned that the prosecutor found the receipt, it is almost certain that they attributed the authority of the prosecutor's office to the receipt's discovery. Moreover, by putting witnesses on the stand and having them testify regarding the circumstances under which *he* found the evidence, the prosecutor implicitly and improperly vouched for the accuracy of their testimony.

In this case, all the prosecutor had to do in order to convey to the jury his belief—indeed his representation, based on personal knowledge—that the receipt was legitimate and that it was found on the up-and-up, was simply to continue to play the role of objective prosecutor. His continued participation in the trial was, in effect, an implicit guarantee to the jury that the receipt was a trustworthy piece of evidence, that it had not been planted, and that the officers who testified regarding the circumstances of the receipt's discovery were credible, honest witnesses whose accounts of the events were to be believed.

An improper message conveyed in this manner is even more prejudicial to the defense than the usual vouching message and implicates many of the concerns cited by the Eleventh Circuit in *Hosford* with respect to the prosecutor-as-witness problem. The prosecutor's personal involvement in the discovery of the receipt plainly served to inform the jury that he had special knowledge regarding its discovery. His involvement also necessarily advised the jury that he personally believed, based on his own observations, that the receipt had not been planted—he was there, he saw the bag, he saw the crumpled up piece of paper lodged underneath the cardboard bottom, he knew somehow that the bag had not been tampered with. Even more, the prosecutor directly asked the witnesses to testify that he had done nothing improper when he discovered the receipt, that neither he nor anyone else had, in fact, planted it.

The prosecutor's implicit testimony was devastating to Edwards's only theory of defense, and it was a blow against which he had no way to defend. Because the prosecutor was not subject to cross-examination, defense counsel did not have a fair opportunity to cast doubt on the circumstances under which the receipt was found.

Our analysis is not affected by the fact that the testimony concerning the prosecutor's participation in the discovery of the receipt was elicited in the first instance by defense counsel. Once the receipt was introduced through use of the unusual procedure employed by the prosecution, defense counsel had no choice but to explore the circumstances surrounding its discovery. If the prosecution succeeded in causing the jurors to believe that the receipt had actually been in the bag all along, they would be almost certain to conclude that the bag and its contents belonged to Edwards. A thorough inquiry into the entire matter of the belated appearance of the receipt was necessary because the police officer who pulled the re-

ceipt out of the bag in front of the jury had testified only the previous day that there was nothing inside the bag from which he could identify the owner. Moreover, defense counsel had in good faith, and on the basis of the discovery he had initiated and received from the prosecution, taken the position in opening argument that there was no evidence that linked Edwards to the bag; and when the receipt was discovered, the district court refused to grant a mistrial or a continuance. Under these highly unusual circumstances, the only course of action available to defense counsel was to emphasize how suspicious it was that the receipt had suddenly appeared in the middle of trial.

In all events, the issue of how and why the receipt suddenly turned up in the middle of trial was a critical issue in the case and the prosecutor was a crucial witness as to that question. It is irrelevant whether a prosecutor is a crucial witness in a matter that favors the defense or in a matter that favors the prosecution, and it is irrelevant which side raises the question as to which his testimony is important. The advocate-witness rule applies in all such instances. Moreover, regardless of who introduced the subject, it was the prosecutor who asked the officer-witnesses to testify that no one (obviously including the prosecutor himself) had planted the evidence. And it was the prosecutor who repeatedly argued that the jury should accept the legitimacy of the receipt and his discovery of it.

Further, we conclude that the prosecutorial vouching in this case warrants reversal of Edwards's conviction because the error can not be characterized as harmless. *See Roberts*, 618 F.2d at 534–35 (applying harmless error analysis). The receipt was, as the prosecutor observed, "a smoking gun." Without the receipt, there was very little evidence connecting Edwards to the black bag. The black bag was found in the trunk of a car that did not belong to Edwards. His prints were not found on it. Indeed, the *only* other evidence even suggesting a link between Edwards and the black bag was the highly questionable hearsay testimony regarding Grimes's statement that she had seen him leave her house with a gun and a black bag, and the gun was not discovered in the car.

The vouching in this case was far more serious than in the ordinary circumstances: The prosecutor did not simply make one or two isolated statements regarding the credibility of a particular witness. Instead, he repeatedly vouched for the reliability of a key piece of evidence, both by presenting witnesses to verify that the receipt was not planted and by arguing that it was a bona fide piece of evidence. In effect, the prosecutor functioned throughout the second half of Edwards's trial as a silent witness for the prosecution. Unlike other witnesses, however, he was not subject to cross-examination and the jury members never had the opportunity to evaluate for themselves whether his story was to be believed.

We hasten to add that we do not intend to be unduly critical of the prosecutor. We are satisfied that the prosecutor acted in good faith throughout the proceedings and that he attempted at all times to conduct himself in an ethical and professional manner. Moreover, the error he made is one that does not reflect upon his competence. Finally, we note that the prosecutor was consistently solicitous of defense counsel's repeated requests for continuances and fair trial procedures. In fact, at one point, after the prosecutor volunteered that the defense's request to reopen cross-examination of a witness was reasonable in light of the prosecution's failure to disclose relevant discovery material in a timely manner, the district judge retorted: "I didn't know you were representing the defendant, Mr. [Prosecutor]."

## III. CONCLUSION

In sum, we conclude that when a prosecutor is personally involved in the discovery of a critical piece of evidence, when that fact is made evident to the jury, and when the reliability of the circumstances surrounding the discovery of the evidence is at issue, the prosecutor's participation in the trial of the defendant constitutes a form of improper vouching. Having determined that the error

924

in this case was not harmless, we reverse.[3]

**REVERSED and REMANDED.**

**3.** Given our decision to reverse on this ground, we need not reach Edwards's other claims of error, including the district court's denial of the joint request for a pretrial continuance.