**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thongsangoune SAYAKHOM,**
**Defendant–Appellant.**

**No. 97–10197.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1999.

Decided July 27, 1999.

Daniel J. Broderick, Assistant Federal Defender, Sacramento, California, for the defendant-appellant.

Samuel Wong, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: BEEZER and TROTT, Circuit Judges, and KING, District Judge.[1]

Opinion by Judge BEEZER; Concurrence by Judge TROTT.

BEEZER, Circuit Judge:

Thongsangoune Sayakhom appeals her convictions and sentence for mail fraud and money laundering. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I

Sayakhom was indicted by a second superseding indictment ("the indictment") on nineteen counts of mail fraud, 18 U.S.C. § 1341, and eleven counts of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). According to the second superseding indictment, Sayakhom formed the Asian Assistance Center ("AAC") to sell life insurance products to low-income members of the Laotian, Cambodian, Hmong and Mien communities in California. The indictment alleges that Sayakhom failed to advise her customers that the AAC was not licensed to sell life insurance products and that the AAC lacked adequate financial reserves to pay potential claims. The indictment charges that Sayakhom engaged in money laundering by conducting and attempting to conduct financial transactions, such as paying for office equipment, rent, car payments and some funeral expenses, to further the mail fraud.

1. The Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

Trial began on September 4, 1996. The court granted the government's motion to dismiss count 18, one of the mail fraud counts. On October 24, 1996, the jury returned guilty verdicts on the remaining mail fraud counts and on seven out of eleven money laundering counts. The jury acquitted Sayakhom on four counts of money laundering. The court sentenced Sayakhom to concurrent sentences of 41 months of imprisonment on each count. This timely appeal followed.

## II

Sayakhom appeals the denial of her motion to suppress evidence seized by warrants from her business, residence and vehicle.[2] The Fourth Amendment requires that the government establish probable cause to support a search warrant. *See* U.S. Const., amend. IV. The Fourth Amendment further dictates that a search warrant must be sufficiently particular and not overbroad. *See United States v. McGrew*, 122 F.3d 847, 849 (9th Cir.1997).

■ Sayakhom acknowledges the existence of probable cause to believe that she was engaging in mail fraud. She argues, however, that the warrant directing the search of her business, residence and vehicle was overbroad because it directed the agents to seize a broad category of personal and business records. The warrant described fourteen categories of property to be seized, including any and all insurance files, records, and billing statements regarding transactions conducted by Sayakhom involving AAC insurance products, mailing lists of individuals solicited for insurance by Sayakhom, and cash, money orders and checks received by AAC for payment of AAC insurance premiums or membership dues.

■ The warrant was not overbroad. A generalized seizure of business documents may be justified if the government estab-

lishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir.1995). The items described in the warrant were sufficiently connected to the allegations of mail fraud described in the indictment.

■ Sayakhom next argues that the warrant failed to establish probable cause to believe that any evidence of mail fraud would be found in her residence or car. An affidavit is sufficient if the stated facts would reasonably allow the magistrate to believe that the evidence will be found in the stated location. *See United States v. Taylor*, 716 F.2d 701, 705 (9th Cir.1983). The relevant search warrant identified the subjects of the search as Sayakhom's residence, her person and her automobile. United States Postal Inspector George Kaufman, in an affidavit incorporated by reference in the warrant, stated his experience and belief that operators of businesses that involve paperwork typically maintain and carry business records into and out of their offices, in their cars and to and from their residences. This affidavit provided sufficient facts to allow the reasonable conclusion that the evidence described in the warrant would be found in Sayakhom's vehicle and residence. We affirm the denial of the motion to suppress.

## III

■ Sayakhom argues that the court erred in allowing the government to use evidence obtained during plea negotiations. Statements made in the course of plea discussions with a United States Attorney are inadmissible pursuant to Federal Rule of Criminal Procedure 11(e)(6)(D) and Federal Rule of Evidence 410. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1367 (9th Cir.1988).

---

**2.** In February and March, 1994, the government obtained and executed warrants to search Sayakhom's business office, residence,

vehicle and post office boxes. Sayakhom does not challenge the warrants authorizing the search of her post office boxes.

On May 26, 1994—after the government executed warrants on Sayakhom's residence, business, vehicle and post office boxes, but before the return of an indictment—Sayakhom and her former attorney, Danny Brace, attended a meeting with Assistant United States Attorney ("AUSA") Wong. California Department of Insurance Investigators Julianne McCoy and Larry Sewell also attended the meeting.

Brace testified that he contacted AUSA Wong after learning about the search warrants relating to Sayakhom's operation of the AAC. According to Brace, he sought to discover "what the charges [were] going to be, what[ ] her exposure [was], and kind of where [ ] we [were]." Wong represented to the court that he advised Brace during this conversation that Sayakhom would be facing mail fraud charges and possibly money laundering charges "in the event that we were unable to resolve this."

The meeting began with Sayakhom explaining, in English and without the assistance of an interpreter, her version of the facts and her belief that what she was doing was not illegal. Sayakhom answered questions from AUSA Wong. AUSA Wong, Investigators Sewell and McCoy warned Sayakhom that selling life insurance without the approval of the State of California was illegal. They told her to stop selling life insurance products.

At the end of the meeting, AUSA Wong advised Sayakhom that he believed she was guilty of federal charges and that he planned to proceed with the filing of charges. He suggested that she consider pleading guilty to mail fraud to avoid any money laundering counts. Brace indicated

that he would send a letter to AUSA Wong containing a settlement offer. Before leaving, Sayakhom turned over to the government checks or money orders.

■ Sayakhom moved to suppress the statements made during the meeting as inadmissible plea negotiations. The district court declined to "put a title" on the meeting, concluding that "[t]here is no magic, anyway, to the term 'plea negotiations.'" The court ruled that Sayakhom's statements during the meeting were inadmissible against her at trial. The court stated that it would allow the government to introduce evidence of warnings given to Sayakhom, followed by a "very careful cautionary instruction" limiting the use of such warnings to establish notice, but not guilt.[3]

At trial, the government presented the testimony of Investigator McCoy to show that Sayakhom knew that the AAC's sale of life insurance products was unlawful. McCoy testified that she, AUSA Wong and Investigator Sewell warned Sayakhom that the unauthorized sale of life insurance was illegal. McCoy further testified that AUSA Wong and Investigator Sewell instructed Sayakhom to stop selling unauthorized insurance products. The court allowed the government to ask McCoy what Sayakhom said in response to these warnings. McCoy answered, "She didn't really say anything. She just nodded her head."

■ Despite the district court's unwillingness to ascribe a label to the meeting, we conclude that the meeting must be characterized as a plea negotiation. A statement was made in the course of plea discussions with a United States Attorney

---

**3.** In reaching this conclusion, the district court analogized the situation to a civil case in which settlement negotiations are introduced to show something other than liability. This analogy is improper. Evidence of attempts to compromise a disputed *civil* claim "is not admissible to prove liability for or invalidity of the claim or its amount." Fed. R.Evid. 408. Such evidence is admissible "when the evidence is offered for another

purpose, such as proving bias or prejudice of a witness...." Fed.R.Evid. 408. Neither Federal Rule of Criminal Procedure 11 nor Federal Rule of Evidence 410 contain such language. With only two exceptions, neither of which is applicable here, the Rules require exclusion of "any statement" made in the course of plea negotiations. *See* Fed. R.Crim. Pro. 11(e)(6); Fed.R.Evid. 410.

if (1) the suspect exhibited an actual subjective expectation that she was negotiating a plea at the time of the discussion and (2) her expectation was reasonable given the totality of the circumstances. *See Leon Guerrero,* 847 F.2d at 1367. Sayakhom exhibited an actual and reasonable expectation that she was negotiating a plea. Sayakhom's counsel arranged the meeting with the AUSA after learning that his client would be indicted, and presented his client to explain her version of the facts and answer the prosecutor's questions. Moreover, the parties discussed the possibility of Sayakhom pleading guilty to mail fraud to avoid money laundering charges. This meeting was a plea negotiation. All statements made in the course of this meeting should have been excluded.

■ Having concluded that the admission of this testimony was erroneous, we must decide whether the error was harmless. *See* Fed. R.Crim. Pro. 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."); *see also United States v. Mezzanatto,* 998 F.2d 1452, 1456 (9th Cir.1993), *rev'd on other grounds by* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). An error not of constitutional magnitude may be disregarded if the government shows that the prejudice resulting from the error was more probably than not harmless. *See United States v. Morales,* 108 F.3d 1031, 1040 (9th Cir.1997) (en banc); *see also United States v. Acosta–Ballardo,* 8 F.3d 1532, 1536 (10th Cir.1993) (treating violation of Rule 11(e)(6) as error not of constitutional magnitude).

The effect of the error was more probably than not harmless. The government presented compelling evidence of Sayakhom's guilt. In particular, the government established that Sayakhom had reason to believe that the unauthorized sale of life insurance products was illegal. The admission of the plea negotiation statements was harmless and does not require reversal.

## IV

■ Sayakhom argues that the district court erred in excluding the testimony of her cultural expert witness. Sayakhom proffered the testimony of Andrew K. Phomthavong as an expert on Laotian culture to testify to "the importance of the burial rite, the history (in Laos and in the United States) of pooling money to help others pay for burial related expenses, the difficulty in learning English and English-based concepts such as insurance, and the lack of education and sophistication by Laotians in general." In the proffer, Sayakhom stated that Phomthavong would not be asked to testify in any way about Sayakhom's mental state or intent. The proffer left open the possibility that he might have been asked to give his opinion on Ms. Sayakhom's cultural sophistication in this country.

■ We review the exclusion of expert testimony for an abuse of discretion, *see United States v. Croft,* 124 F.3d 1109, 1120 n. 3 (9th Cir.1997), and observe none here. The district court acted within its discretion in concluding that the testimony would not have been helpful to the jury in the resolution of Sayakhom's guilt. *See United States v. Hoac,* 990 F.2d 1099, 1103 (9th Cir.1993) (exclusion of testimony by expert on Chinese culture not abuse of discretion where expert's knowledge of defendant was limited and testimony would not have helped the jury); *United States v. Rubio–Villareal,* 927 F.2d 1495, 1502 (9th Cir. 1991), *amended on other grounds by* 967 F.2d 294 (9th Cir.1992) (denial of defense request to admit expert testimony on Mexican culture not abuse of discretion). We affirm the denial of Sayakhom's motion to allow the expert testimony.

## V

■ Sayakhom appeals the denial of her motion to admit an audio tape and transcript of a December 21, 1993 meeting at the AAC between Sayakhom and Cali-

fornia Department of Insurance Investigators Sewell, McCoy and Joe Del'Marmol. Sayakhom moved to play the entire recording for the jury and to distribute copies of the transcript, arguing that the recording was relevant to her state of mind. The court denied the motion on the basis that the recording was inadmissible hearsay. The court left open the possibility that either side could use the transcript for impeachment or any other purpose that would independently generate the use of the evidence.

▬▬ We review the exclusion of evidence under the hearsay rules for abuse of discretion. *See United States v. Matta-Ballesteros*, 71 F.3d 754, 767 (9th Cir. 1995), *as amended by* 98 F.3d 1100 (9th Cir.1996), *cert. denied*, 519 U.S. 1118, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997). Hearsay is an out of court statement offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c). Sayakhom sought to introduce the recording to show her knowledge in order to refute the intent requirement of the crimes charged.[4] Sayakhom thus proffered the tape to prove the truth of her statements to the investigators. The recording is hearsay.

Contrary to Sayakhom's argument, the recording does not fall within the hearsay exception of Federal Rule of Evidence 803(3). Rule 803(3) creates an exception to the hearsay rule for a statement of the declarant's "then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, identification, or terms of declarant's will." Fed. R.Evid. 803(3). Sayakhom's attempt to introduce statements of her belief (that she was not violating the law) to prove the

fact believed (that she was acting in goodfaith) is improper.

The district court correctly denied Sayakhom's motion to play the recording and admit the transcript.

## VI

▬▬ Sayakhom contends that the district court erred in allowing the government to introduce evidence of misconduct not charged in the indictment. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Whether evidence admitted at trial is directly relevant to the crime charged or relevant only to "other crimes" is a question of law reviewed de novo. *See United States v. Ripinsky*, 109 F.3d 1436, 1442 (9th Cir.), *as amended by* 129 F.3d 518 (9th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 870, 139 L.Ed.2d 767 (1998), *overruled on other grounds see United States v. Sablan*, 114 F.3d 913, 916 (9th Cir.1997); *United States v. Jackson*, 84 F.3d 1154, 1158 (9th Cir.1996).

## A

▬▬ Sayakhom challenges the introduction of evidence regarding her Mutual Assistance Planning Services Program ("MAPS"). Sayakhom began operating MAPS after the government effectively shut down the AAC's operation. Sayakhom now admits that the MAPS program involved the illegal sale of life insurance products.

▬▬ The MAPS evidence is not subject to exclusion under Rule 404(b) because it is inextricably intertwined with the indicted crimes. "Evidence should not be treat-

---

4. Sayakhom now argues on appeal that the recording was not offered to prove its truth but instead to show her language fluency. This argument is not properly before us. Sayakhom did not raise this theory before the district court. We do not decide this issue

because it was not presented to the district court. *See United States v. Tisor*, 96 F.3d 370, 376 (9th Cir.1996), *cert. denied*, 519 U.S. 1140, 117 S.Ct. 1012, 136 L.Ed.2d 889 (1997).

ed as 'other crimes' evidence when 'the evidence concerning the [other] act and the evidence concerning the crime charged are inextricably intertwined.'" *United States v. Soliman,* 813 F.2d 277, 279 (9th Cir.1987) (citing *United States v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979)); *see also Ripinsky,* 109 F.3d at 1442 (uncharged crimes were "direct evidence of the ongoing conspiracy charged in the indictment"); *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1012 (9th Cir.1995) ("when it is clear that particular acts of the defendant are part of, and thus inextricably intertwined with, a single criminal transaction," admission of evidence of those acts does not violate Rule 404(b)).

The government presented testimony that Sayakhom began operating MAPS after the closure of the AAC in order to continue the unlawful sale of life insurance products. The government presented evidence that Sayakhom attempted to recruit former AAC employees to sell products for MAPS. The government introduced testimony that Sayakhom attempted to convert AAC clients to the MAPS program. This evidence tends to show that Sayakhom continued her fraudulent scheme through the operation of MAPS.

The government's documentary evidence provides compelling evidence of the direct connection between the AAC and MAPS. The government produced a MAPS registration packet that uses the "AAC" and "MAPS" names interchangeably. The government presented an Agreement Statement, signed by Sayakhom and bearing the names of the AAC and MAPS. The Statement is addressed "Dear Member" and begins, "Welcome! You are now a member of the Mutual Assistance Planning Service Center." The government introduced a January 12, 1995, letter from Sayakhom to AAC members on AAC letterhead with a bank deposit stamp for MAPS' First National Bank account. The letter informs "all members" that beginning January 1, 1995, the AAC "has presently reopened" and directs all members to contin-

ue their payments immediately. A January 29, 1995 letter to "all members" from Sayakhom verifies the "permanent office location" of "AAC or MAPSC". The letter directs members, "do not use" the Sacramento post office box "at all." (Emphasis in original.)

This evidence establishes that AAC and MAPS were part of an ongoing scheme to defraud. MAPS was simply a disguise for Sayakhom's continued sale of unauthorized insurance products after the government shut down the AAC. The MAPS evidence illuminates Sayakhom's state of mind and shows that she was not deterred by the rule of law. The evidence of Sayakhom's continued sale of insurance after being warned of its illegality generates the inference that she was indifferent to the law regarding the sale of insurance products. If she did not care about the illegality of her actions *after* being warned, it is fair to assume that she had known the program was unlawful and did not care. We detect no abuse of discretion in the admission of the MAPS evidence as direct evidence of the charges in the indictment.

### B

We summarily reject Sayakhom's remaining contentions that the court erred in allowing the government to introduce evidence of other uncharged acts during its case in chief.

█ First, the court correctly overruled Sayakhom's relevance-based objection to the government's presentation of testimony as to alleged welfare fraud. An AAC client testified that he told Sayakhom that he received welfare benefits and thus would have to report to the welfare authorities any check he received from the AAC. According to the witness, Sayakhom told him that if he wrote the check for AAC payments directly to her, then she would pay his benefits in cash. Evidence that Sayakhom encouraged her clients to write their checks to her, rather than to the AAC, is probative of the fraudulent

scheme alleged in the indictment. The district court acted within its discretion in admitting this evidence.

 Second, the court properly allowed the introduction of testimony regarding bad checks issued by the AAC. The government offered the testimony of a former AAC employee that the bank refused to honor two paychecks from the AAC for insufficient funds. In addition, the government introduced the testimony of an AAC client that the bank refused to honor a $2000 check for insufficient funds. This evidence tends to show that the AAC was not solvent. It is relevant to the allegations in the indictment that Sayakhom concealed the AAC's lack of financial reserves.

 Third, the court correctly allowed the government to introduce evidence of a lapse in the renewal of Sayakhom's license to sell insurance. Admission of this evidence was proper because it is relevant to the allegations of unlawful sales of insurance during the period identified in the indictment and to Sayakhom's knowledge of the illegality.

 Fourth, the court properly allowed the government to introduce Sayakhom's representation to her car insurance company that her automobile would only be used for personal purposes. The district court acted within its discretion in allowing this evidence because it was relevant to prove that Sayakhom misused AAC funds by paying the insurance premiums for the vehicle from the AAC account.

## VII

Sayakhom challenges the jury instructions with respect to her defense of good faith and the elements of money laundering.

## A

 Sayakhom appeals the denial of her request to instruct the jury on the defense theory of reliance on public au-thority. Sayakhom presented the testimony of her daughter, Dawnie Sayakhom, to support her defense. According to Dawnie, she and Sayakhom went to City Hall, spoke with clerks at the desk and explained that they were operating the AAC as a nonprofit organization to hold money for funeral expenses. Dawnie testified that none of the clerks informed them that they needed approval of the Department of Insurance to operate the AAC.

Sayakhom proposed the following instruction:

Defendant asserts that she did not knowingly violate the law because authorized governmental officials told her that her conduct was legal and she believed these officials. In order to establish this defense the defendant must introduce evidence that she relied upon the statement or statements of governmental officials and that this reliance was reasonable in that a person trying to obey the law would have accepted the information as true and would not have been put on notice to make further inquiries.

If you find that the defendant has introduced such evidence, then the burden is on the government to disprove this evidence beyond a reasonable doubt.

The court refused Sayakhom's proposed public authority defense. The court concluded that Sayakhom's public authority defense was covered by the good faith instruction. The court stated that it would allow defense counsel to argue reliance on public authority in summation.

 Although the failure of a trial judge to instruct the jury on a theory of the defense may constitute reversible error, a judge may reject a defendant's proposed instruction if the other instructions, viewed in their entirety, adequately cover that theory. *See United States v. Govan,* 152 F.3d 1088, 1093 (9th Cir.1998). We review de novo the question whether other jury instructions adequately cover the defense theory in a proposed instruction. *See United States v. Gomez–Osorio,* 957

F.2d 636, 642 (9th Cir.1992). Here, the court instructed the jury with respect to good faith as follows:

> [Instruction Number] 12, good faith is a complete defense to the charges in the indictment since good faith on the part of the defendant is inconsistent with knowingly intending to defraud, which is an essential part of the charges. The burden of proof is not on the defendant to prove her good faith, of course, since she has no burden to prove anything.
>
> The United States must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the indictment. One who expresses an opinion honestly held by her or belief honestly entertained by her is not chargeable with fraudulent intent even though her opinion is erroneous or her belief is mistaken. And similarly, evidence which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish fraudulent intent.
>
> While the term "good faith" has no precise definition, it means among other things a belief or opinion honestly held with an absence of malice or ill will and intention of taking unfair advantage of another.

The good faith jury instruction explained that a person lacks criminal intent in expressing an opinion or belief honestly, although erroneously, held. The court's good faith instruction adequately instructed the jury as to Sayakhom's defense.

We affirm the denial of the public authority instruction because the good faith instruction adequately covered the defense theory.

**B**

■■ Sayakhom argues that the court erred in its instructions on money laundering. We review de novo the purely legal question whether a jury instruction misstates elements of a statutory crime. *See United States v. English,* 92 F.3d 909, 914 (9th Cir.1996).

■■ The indictment charges Sayakhom with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The court instructed the jury as follows:

> .... In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant conducted a financial transaction involving property that represented the proceeds of mail fraud activities as described in the indictment.
>
> Second, the defendant knew that the property represented the proceeds of mail fraud activities as described in the indictment.
>
> Third, the defendant acted with the intent to promote the carrying on of mail fraud activity as described in the indictment. A financial transaction is a transaction involving the use of a financial institution which is engaged in or the activities of which effect interstate or foreign commerce in any way.

This instruction follows the elements set forth in the money laundering statute, 18 U.S.C. § 1956(a)(1)(A),[5] and the Ninth Circuit's Model Jury Instruction for alleged violations of § 1956(a)(1)(A), *see* Ninth Cir. Model Crim. Instructions, 8.33.1.

Sayakhom argues that our holding in *United States v. Savage,* 67 F.3d 1435,

---

**5.** Section 1956(a)(1) provides in relevant part:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity.... shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.
18 U.S.C. § 1956(a)(1).

1441 (9th Cir.1995), requires the government to prove, as an element of the offense of money laundering, that the laundered money was obtained from prior, separate criminal activity. Sayakhom misconstrues *Savage.* In *Savage,* the defendant defrauded investors by claiming that if they sent him $5000 he could obtain foreign loans and pay each investor $10 million. *See* 67 F.3d at 1437. The money was deposited into an American bank, transferred to another account at the same bank, sent to accounts in Austria and finally returned to Savage's personal account in the United States, or to pay his bills. *See id.* at 1438. Savage challenged whether the monetary transfers involved "proceeds of specified unlawful activity." *Id.* at 1441. Savage argued that, because the predicate acts of wire and mail fraud were not complete until the money (obtained by fraud) was transferred overseas and then back to Savage's personal account in the United States, the transferred money was not "proceeds" of wire and mail fraud charged in the indictment. *See id.* at 1441–42. We rejected this argument and concluded that the fraud offenses were complete before the money was transferred, when Savage mailed newsletters and membership applications to promote his operation. *See id.* at 1442.

We did not create in *Savage* an additional element of proof for the crime of money laundering. Rather, our "prior, separate criminal activity" language in *Savage* refers to the differentiation between money laundering and the predicate acts of mail fraud. *See United States v. Anthony,* 169 F.3d 798, 809 n. 12 (3rd Cir.1999) (describing *Savage* as "involv[ing] the temporal question whether, at the time the alleged money laundering transaction occurred, the money involved in the transaction was proceeds"). *Savage* does not require the court to instruct the jury that the government must prove that the proceeds of the

money laundering were derived from prior, separate criminal activity.

The court properly instructed the jury with respect to the elements of the offense of money laundering.

## VIII

 Sayakhom next challenges the sufficiency of the evidence to support the money laundering and mail fraud convictions.[6] We decide, viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Ross,* 123 F.3d 1181, 1184 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998).

## A

 The evidence was sufficient to support the mail fraud convictions. The essential elements of mail fraud under 18 U.S.C. § 1341 are (1) the existence of a scheme to defraud and (2) using or causing the use of the mail to execute the scheme. *See United States v. Serang,* 156 F.3d 910, 914 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 627, 142 L.Ed.2d 565 (1998). To prove a fraudulent scheme, the government must demonstrate specific intent to defraud. *See United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979). Intent need not be established by direct evidence, but may be inferred from the defendant's statements and conduct. *See id.* "Deceitful statements of half truths or the concealment of material facts is actual fraud under the mail fraud statute." *Id.*

Sayakhom concedes that there is sufficient proof of mailing. At issue is whether the government proved that Sayakhom acted with intent to defraud by concealing from AAC customers that the AAC was not licensed to sell insurance products and misrepresenting the AAC's ability to pay

---

**6.** Sayakhom renewed her motion for judgment of acquittal after the close of evidence. Consequently, she preserved the right to test the sufficiency of the evidence on appeal. *See United States v. Bancalari,* 110 F.3d 1425, 1428 (9th Cir.1997).

death benefits in light of the organization's inadequate financial reserves.

1

 The government proved that Sayakhom knowingly concealed that the AAC was not authorized to sell life insurance products. "One who acts with reckless indifference to whether a representation is true or false is chargeable with knowledge of its falsity." *Id.* After immigrating to the United States from Laos, Sayakhom studied English as a second language, taught English to refugee women and worked as an interpreter for medical staff. She completed 59 units at a junior college and obtained a certificate in Social Work/Human Services. She performed clerical work from 1984 to 1988 at Fireman's Fund Insurance Company. From 1988 to May 1989, she worked as an administrator at Experience Insurance Services. On May 4, 1989, Sayakhom passed the Fire and Casualty solicitor exam and became a licensed fire and casualty insurance broker/agent. Sayakhom began working as an insurance agent for ITT Life Insurance through Coordinated Concepts.

 Richard Gooch, a former partner of Coordinated Concepts, testified on behalf of the government at trial. He testified that in October 1993 he told Sayakhom that she needed to obtain approval of the California Department of Insurance to sell life insurance products, warned her against using the ITT insurance company logo on any AAC literature and explained the necessity of financial reserves.[7]

Viewed in a light most favorable to the government, the evidence demonstrates that Sayakhom knew at all times charged in the indictment that the AAC was engaged in the unauthorized sale of life insurance products. The jury reasonably could have concluded that Sayakhom made fraudulent misrepresentations regarding her sale of the AAC's insurance policies.

2

We reject Sayakhom's contention that the government failed to prove that the AAC lacked adequate financial reserves. At trial, the government carefully showed that the AAC's primary bank account was consistently underfunded. This evidence established that the AAC would have been unable to pay potential claims at the point of each of the mailings charged in the indictment. Moreover, the government introduced testimony that before starting the AAC, Sayakhom operated a post-death benefit program. That program crumbled when three members died at the same time. On this record, a rational trier of fact could have found that the government proved that Sayakhom misrepresented the AAC's ability to pay death benefits at each point alleged in the indictment.

Viewing the evidence in a light most favorable to the government, we are persuaded that a rational trier of fact could have concluded beyond a reasonable doubt that Sayakhom was guilty of mail fraud. We affirm the mail fraud convictions.

B

 The evidence is sufficient to support Sayakhom's money laundering convictions. The money laundering statute requires the government to prove that Sayakhom conducted financial transactions involving the proceeds of the mail fraud offenses charged in the indictment, knowing that the money represented the

---

7. Sayakhom concedes that if Gooch's testimony was the only evidence in this case, then a reasonable juror could find sufficient knowledge for all subsequent mailings. Sayakhom argues that if the jury had heard the tape recording of the meeting between Sayakhom and the Department of Insurance investigators, no reasonable juror could find an intent to defraud. The tape recording was not evidence. In reviewing Sayakhom's challenge to the sufficiency of the evidence, we look at the evidence actually presented at trial. On the basis of this evidence, we hold that a rational trier of fact reasonably could have concluded that Sayakhom acted with intent to defraud.

proceeds of the mail fraud, with the intent to promote the fraud. *See* 18 U.S.C. § 1956(a)(1).

Sayakhom argues that the government failed to prove that the money that was laundered resulted from "prior, separate criminal activity." We disagree. The acts of mail fraud were complete when Sayakhom mailed the application materials to potential AAC customers. *See, e.g., Savage,* 67 F.3d at 1442 (predicate offenses of domestic mail fraud and wire fraud were complete "at the point at which Savage ... mailed the promotional information or wired the money in the United States"). The money Sayakhom received in response to these mailings was "proceeds" within the meaning of the money laundering statute.

We reject Sayakhom's assertion that the evidence of intent is insufficient to support the money laundering convictions. To prove the requisite intent, the government must show that the defendant knew the property involved in the transaction represented the proceeds of some form of unlawful activity. *See* 18 U.S.C. § 1956(a)(1). Sayakhom admits to knowing she was using funds from the AAC to engage in the financial transactions described in the indictment. She insists that the government failed to establish that she knew the AAC's financial transactions were illegal. We disagree. On the basis of the evidence produced at trial, a reasonable juror could have concluded that Sayakhom knew she was engaging in unlawful activity in selling the unauthorized insurance products.[8]

We affirm Sayakhom's money laundering convictions because a rational trier of fact could have found the essential elements of money laundering beyond a reasonable doubt.

8. Sayakhom's reliance on *United States v. Heaps,* 39 F.3d 479 (4th Cir.1994), is unavailing. Sayakhom bases her argument on the Fourth Circuit's statement in *Heaps* that a defendant "may not be convicted on just what he should have known." *Id.* at 484. The court continues: "However, both direct and circumstantial evidence can be used to estab-

**IX**

■ Sayakhom seeks reversal of her convictions on the basis of alleged prosecutorial misconduct. Reversal on this basis is justified only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial. *See United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986).

■ Sayakhom argues that the prosecutor violated the advocate-witness rule and engaged in improper vouching by presenting the statements of AUSA Wong through the testimony of a government witness. As the basis for both allegations, she points to Investigator McCoy's testimony that AUSA Wong warned Sayakhom to cease the unauthorized sale of insurance products.

■ The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation. *See United States v. Prantil,* 764 F.2d 548, 552–53 (9th Cir.1985). The policies underlying this rule "are related to the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors." *United States v. Edwards,* 154 F.3d 915, 921 (9th Cir.1998).

Although AUSA Wong did not testify as a witness, we consider whether the presentation of Wong's warnings to Sayakhom through the testimony of Investigator McCoy violated the advocate-witness rule. *See id.* at 922 (applying advocate-witness rule to prosecutor's "implicit testimony" through government's case agent); *Prantil,* 764 F.2d at 551 ("[A]lthough he never

lish knowledge and are given the same weight." *Id.; see also United States v. Rasheed,* 663 F.2d 843, 848 (9th Cir.1981) ("Fraudulent intent may, and often must, be proven by circumstantial evidence."). The government produced compelling circumstantial evidence of Sayakhom's fraudulent intent.

took the stand, [the prosecutor] was a witness to, and indeed a participant in, some aspect of all of the events alleged in the indictment."). We conclude that the prosecutor did not violate the advocate-witness rule.

In *Edwards,* we reversed the appellant's conviction of possession of cocaine with intent to distribute on the basis of prosecutorial misconduct. 154 F.3d at 917. During trial, the Assistant United States Attorney personally found a critical piece of physical evidence, previously unknown to the parties, tying the defendant to the cocaine. *Id.* at 917. The circumstances surrounding the prosecutor's discovery became the subject of contention at trial. *Id.* We concluded that the prosecutor's continued representation of the government at trial violated the advocate-witness rule. *Id.* at 922. We explained, "Once the members of the jury learned that the prosecutor found the [evidence] it is almost certain that they attributed the authority of the prosecutor's office to the receipt's discovery." *Id.*

In the instant case, Investigator McCoy testified to her first-hand knowledge regarding a meeting she attended with Sayakhom, Sayakhom's attorney, AUSA Wong, Inspector Kaufman and Investigator Sewell. Unlike the situation in *Edwards, id.* at 918, involving testimony about evidence discovered by the prosecutor and two police officers in the defendant's absence, McCoy testified to warnings made to Sayakhom during a meeting Sayakhom attended. The subject of this testimony was not disputed.[9] The evidence of the warnings was not offered for its truth; rather it was offered to prove

Sayakhom's knowledge that her actions were unlawful.

Finally, we are persuaded that McCoy's testimony about the warnings did not result in any unfairness to Sayakhom. McCoy was subject to cross-examination by defense counsel, and defense counsel specifically asked McCoy about the meeting. In addition, the court stated that it would permit the defense to call AUSA Wong as a witness to test the accuracy of McCoy's testimony. *Cf. Edwards* 154 F.3d at 922 ("Because the prosecutor was not subject to cross-examination, defense counsel did not have a fair opportunity to cast doubt on the circumstances under which the [evidence] was found."). Sayakhom could have challenged McCoy's account through the testimony of one of the other individuals,[10] including Sayakhom herself or her former attorney, who attended the meeting. *Cf. United States v. Watson,* 87 F.3d 927, (7th Cir.1996) ("The correct procedure [for an AUSA to follow] is to avoid interviewing a suspect except in the presence of a third person so that the third person can testify about the interview."). The presentation of McCoy's testimony regarding the prosecutor's uncontested statements made to Sayakhom in the presence of third parties did not violate the advocate-witness rule.

 Nor did the prosecutor engage in improper vouching. A prosecutor may not impart to the jury his belief that a government witness is credible. *See United States v. Edwards,* 154 F.3d 915, 921 (9th Cir.1998). The prosecutor did not, through his questioning of McCoy as to uncontested matters, impart to the jury a belief that McCoy is credible. The presen-

---

9. During the hearing on Sayakhom's motion to suppress the warnings as plea negotiations, AUSA Wong proffered to the court his version of the events. Defense counsel accepted the prosecutor's factual representations and declined to cross-examine the prosecutor at that time.

10. Inspector Kaufman testified at trial, but he was not asked about AUSA Wong's warnings to Sayakhom. Investigator Sewell also testified for the government. When the prosecutor asked Sewell whether any warnings were made to Sayakhom at the meeting, defense counsel objected to the testimony as "cumulative." Defense counsel did not cross-examine Sewell about the meeting.

tation of this testimony does not amount to improper vouching.

 Sayakhom next argues that the government violated Federal Rule of Evidence 408 by introducing evidence relating to compromise negotiations. The court ruled before trial that the government could show that policy holders demanded payment and that the defendant did not pay immediately. The court stated that such evidence could be admitted without reference to the existence of a lawsuit or settlement. At trial, the government introduced the testimony of two claimants, and argued to the jury that Sayakhom promised to pay on two death claims. Sayakhom failed to object to these statements at trial. When there is no objection to the prosecutor's comments, we review only for plain error. *See United States v. Etsitty*, 130 F.3d 420, 424 (9th Cir.1997), *as amended by* 140 F.3d 1274 (9th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998). We detect no such error here. Nothing in the portions of the transcript cited by Sayakhom indicates that the prosecutor exceeded the bounds of the court's in limine ruling.

 Sayakhom contends that the government's witnesses were improperly coached. Sayakhom points to the testimony of a witness for the government, who asked in response to a question from defense counsel, "How do you want me to answer that?" The government argues that the witness was simply confused by multiple questions on cross-examination from defense counsel. Cross-examination and argument are the primary tools for addressing improper witness coaching. *See Geders v. United States*, 425 U.S. 80, 89–90, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) ("opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses"). Defense counsel was free to address the witness' credibility on cross-examination or in closing argument. Sayakhom has not shown that this

exchange materially affected the fairness of the trial.

██ Sayakhom contends that the prosecutor engaged in misconduct by discrediting defense counsel. In an attempt during opening statement to highlight the differences between Lao and English, defense counsel informed the jury that Lao does not use punctuation signs. A witness for the government, who testified to knowing how to read and write Lao and to teaching other people to read and write Lao, testified that Lao does use punctuation. Defense counsel objected to the testimony and asked to read into evidence a letter from an interpreter to support defense counsel's statement. The prosecutor stipulated to counsel reading the letter. Sayakhom has not established that any unfairness resulted from the prosecutor's actions. This allegation of prosecutorial misconduct does not require reversal.

██ Sayakhom argues that she is entitled to a new trial because the prosecutor misstated testimony to the jury. For example, Sayakhom insists that the prosecutor engaged in misconduct by suggesting that Sayakhom had no difficulty communicating with English-speaking people because the evidence shows that she was unable to communicate effectively in English. Sayakhom's familiarity with English was relevant to the issue of intent, a matter for the jury to decide. Although Sayakhom disagrees with the prosecutor's account of disputed facts, Sayakhom has not shown that his comments materially affected the fairness of the trial.

██ Sayakhom contends that the prosecutor engaged in misconduct by posing unsupported hypothetical questions to government witnesses. Sayakhom first cites the prosecutor's question to Jeff Bangeter, "If [Sayakhom] were saying that ITT Life Insurance Company was backing up the [AAC], would you have known?" Defense counsel objected to the question and the court sustained the objection. Sayakhom

next cites the prosecutor's asking Scott O'Briant whether Sayakhom paid for her husband's apartment with AAC funds. O'Briant answered affirmatively; the court sustained defense counsel's objection and directed the jury to disregard the question and answer. This allegation of prosecutorial misconduct does not require reversal.

█ Sayakhom argues that the prosecutor engaged in misconduct in its discussion of a statement in AAC materials that participation in the AAC would not affect welfare or disability income unless the recipient reported the receipt. The prosecutor asked, "Why does she include a statement like that? Was she trying to help her clients defraud the government?" In response to defense counsel's objection, the court instructed the jury that the attorneys' statements were not evidence and that Sayakhom was on trial only for the charges in the indictment. The statements, followed by the court's instruction, did not materially affect the fairness of the trial.

█ Sayakhom contends that the prosecutor engaged in misconduct by failing to obey court orders. For example, Sayakhom directs our attention to the prosecutor's introduction of an exhibit containing evidence that had been excluded. This allegation of misconduct does not warrant reversal. The prosecutor apologized to counsel and to the court for forgetting about the ruling. The prosecutor's unintentional error did not materially affect the fairness of the proceedings.

## X

█ Sayakhom contends that the court erred in calculating loss at sentencing. We review de novo the district court's interpretation of the Sentencing Guidelines. *See United States v. Bailey,* 139 F.3d 667, 667 (9th Cir.1998). We review the court's application of the Sentencing Guidelines to the facts of a particular case for abuse of discretion. *See United States v. Aguilar–Ayala,* 120 F.3d 176,

177–78 (9th Cir.1997) (citing *Koon v. United States,* 518 U.S. 81, 99, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). We review for clear error the factual findings underlying the court's sentencing decision. *See United States v. Barnes,* 125 F.3d 1287, 1290 (9th Cir.1997).

█ The Sentencing Guidelines provide a base offense level for fraud, with incremental increases based on the amount of monetary loss caused by the fraud. *See* U.S.S.G. § 2F1.1(a), (b)(1); *Barnes,* 125 F.3d at 1290. Under the Sentencing Guidelines, loss is "the value of money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, cmt. 7. Here, the district court adopted the probation officer's calculation of $397,744 as the amount Sayakhom received from clients of the AAC including premiums, membership fees and deposits. The court subtracted $21,000 in refunds or death benefits paid to clients, to reach a total loss of $376,744.

Sayakhom contends that her actual or intended gain is the proper measure of loss. "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, cmt. 8. The loss estimate may be based on the offender's gain; however this is "an alternative estimate that ordinarily will underestimate the loss." *Id.* The court was not obligated to estimate the loss on the basis of Sayakhom's gain. The court properly calculated loss as the value of money unlawfully taken.

Sayakhom next argues that the value of money lawfully received as membership or deposit fees should be excluded from the loss calculation. We have recognized that "value may be rendered even amid fraudulent conduct," and that in calculating loss, the district court should give credit for any legitimate services rendered to the victims. *United States v. Blitz,* 151 F.3d 1002, 1012 (9th Cir.1998) (citing *Barnes,* 125 F.3d at 1291 & n. 1), *cert. denied,* —— U.S. ——,

119 S.Ct. 567, 142 L.Ed.2d 473 (1998). However, if the "value" to the victim is merely a part of the fraudulent scheme, the defendant is not entitled to a credit. *See id.* (holding defendants not entitled to credit for recoveries that "enabled [defendants] to continue their scheme for a longer period by staving off detection"). The district court declined to credit Sayakhom with any of the expenses of operating the AAC on the grounds that the AAC was permeated with fraud. In the absence of clear error, we defer to the court's factual finding. Sayakhom is not entitled to a credit for the value of membership fees or deposits. We affirm Sayakhom's sentence.

For the reasons set forth in this opinion, Sayakhom's convictions and sentence are

AFFIRMED.

TROTT, Circuit Judge, concurring in the results:

The advocate-witness rule would have barred the prosecutor in this case from taking the stand at trial and testifying that he warned Sayakhom that her business was illegal and advised her to cease her illegal operation. *See United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986); *United States v. Edwards,* 154 F.3d 915, 921 (9th Cir.1998). Instead, AUSA Wong called an investigator who testified that he, Wong, told the defendant that what she was doing "was a crime," that she should stop, and that if she didn't do so, she could be "charged with the additional crimes."

In my view, AUSA Wong should not have been permitted to do through a surrogate what he could not have done himself. Moreover, through this surrogate testimony, he vouched for the legal validity of his case.

Nevertheless, this error was demonstrably harmless given the rest of the evidence on the issue, and I otherwise concur in Judge Beezer's comprehensive opinion.